JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

2 Guyz LLC d/b/a Pike's Pub; James F. McCarthy; Matthew J. McCarthy

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark E. Seiberling, Esq.
Kleinbard LLC
1717 Arch Street, 5th Floor

## DEFENDANTS

Upper Southampton Township, Margaret M. Hoeger, Martin Hoeger, Steam Pub, Dominic Varacallo, Michael Kaminski,

County of Residence of First Listed Defendant ____________
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [x] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(*Do not cite jurisdictional statutes unless diversity*)**:
42 U.S.C. § 1983

Brief description of cause:
Civil-rights action for violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 and state law claims.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
10/19/2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Mark E. Seiberling

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Upper Southampton Township, Bucks County, Pennsylvania

***RELATED CASE IF ANY:*** Case Number:______________________ Judge:________________________________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

*A.* ***Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief ***see certification below***
☐ 16. All Other Federal Question Cases. *(Please specify)*:______________________________

**B.** ***Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury (*Please specify*):________________
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*____________ ______________________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| 2 GUYZ LLC d/b/a PIKE'S PUB; JAMES F. McCARTHY; and MATTHEW J. McCARTHY,<br><br>*Plaintiffs,*<br><br>v.<br><br>UPPER SOUTHAMPTON TOWNSHIP; MARGARET M. HOEGER, individually; MARTIN HOEGER; STEAM PUB; DOMINIC VARACALLO, individually; MICHAEL KAMINSKI, individually; MATTHEW BANKERT, individually; SCOTT HARTRANFT, individually; FRANCIS BRUTOSKY, individually; BRIAN C. FETTEROLF, individually; J. BLAKER, individually; M. ROSKOS, individually; and JOHN DOES 1–10,<br><br>*Defendants.* | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs 2 Guyz LLC d/b/a Pike's Pub ("Pike's"), James F. McCarthy ("Jim McCarthy"), and Matthew J. McCarthy ("Matt McCarthy") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants Upper Southampton Township (the "Township"), Margaret M. Hoeger a/k/a Maggie Hoeger ("Hoeger"), Martin Hoeger, Steam Pub, Dominic Varacallo ("Chief Varacallo"), Michael Kaminski ("Officer Kaminski"), Matthew Bankert ("Officer Bankert"), Scott Hartranft ("Sergeant Hartranft"), Francis Brutosky ("Officer Brutosky"), Brian C. Fetterolf ("Officer Fetterolf"), J. Blaker ("Officer Blaker"), M. Roskos ("Officer Roskos"), and John Does 1–10 (collectively, "Defendants"), and aver as follows:

## INTRODUCTION

1. This civil-rights action arises from a sustained and coordinated pattern of selective governmental enforcement directed against Pike's, a restaurant and bar located in Upper Southampton Township, Bucks County, Pennsylvania, allegedly for the benefit of a competing establishment with longstanding relationships with Township officials and law-enforcement personnel.

2. Plaintiffs allege that governmental authority was improperly used to target Pike's, its owners, and its operators for heightened police and liquor-enforcement scrutiny while similarly situated establishments were treated more favorably.

3. The circumstances are particularly troubling because, during the relevant period, one of the Township's elected Supervisors, Defendant Margaret M. Hoeger a/k/a Maggie Hoeger, performed accounting work for and/or maintained a financial and business relationship with Defendant Steam Pub, a restaurant and bar that directly competes with Pike's.

4. Defendant Martin Hoeger, Hoeger's husband, owns and operates Steam Pub.

5. Hoeger served as an elected member of the Upper Southampton Township Board of Supervisors during the period in which much of the police and regulatory activity challenged in this action occurred. Hoeger resigned from the Board of Supervisors in May 2026.

6. Thus, during the relevant period preceding her resignation, Hoeger maintained a business and financial relationship with a

business competing with Pike's while simultaneously occupying a position of governmental authority within Upper Southampton Township, creating an apparent conflict between her public responsibilities and her private financial interests.

7. Under Pennsylvania law, the Board of Supervisors of Upper Southampton Township is charged with the general governance of the Township and the exercise of its legislative, executive, and administrative powers. With respect specifically to the Township Police Department, Pennsylvania law provides that the Board of Supervisors "shall provide for the organization and supervision and determine the number and the compensation" of the Township police force. *See* 53 P.S. § 66902.

8. Thus, during the period relevant to this action, Hoeger was not merely an elected official possessing informal access to Township personnel. She was one of five members of the Township's governing body that possessed statutory responsibility for the organization and supervision of the Township Police Department—the same Police Department whose officers, supervisors, and Chief engaged in the conduct challenged herein.

9. Hoeger's position therefore afforded her official governmental status, access to Township leadership, and opportunities to communicate with the Chief of Police and other Township police personnel concerning police operations and enforcement matters.

10. The relationship between Steam Pub and Township government was not limited to Hoeger's service on the Board.

11. For years, the Upper Southampton Township Board of Supervisors regularly held weekly Township meetings at Steam Pub.

12. Those meetings brought Township Supervisors, officials, and personnel to Steam Pub on a regular and recurring basis and made Steam Pub a regular gathering place for Township governmental officials.

13. The relationship extended to the Township Police Department. Defendant Officer Bankert told Matt McCarthy that Upper Southampton Police had maintained a "good relationship with Marty"—referring to Defendant Martin Hoeger—"for about 10 years," or words to that effect.

14. Against this backdrop, since approximately 2020, Pike's and the McCarthys have been subjected to repeated police and liquor-enforcement scrutiny that escalated during 2024 and 2025.

15. That scrutiny included directed police patrols, officer-initiated closing-time checks, monitoring of Pike's and its patrons, allegations concerning after-hours activity and drug activity, repeated referrals to liquor-enforcement authorities, undercover investigations, inspections, a coordinated police/Bureau of Liquor Control Enforcement ("BLCE") enforcement operation, and repeated liquor-enforcement proceedings.

16. Township police records expressly document officers conducting "directed patrol" activity at Pike's and making officer-initiated visits for the specific purpose of determining whether Pike's had closed.

17. Township police officers also transmitted information concerning Pike's to liquor-enforcement authorities and repeatedly made or threatened regulatory referrals concerning Pike's.

18. Defendant Chief Varacallo personally communicated allegations concerning Pike's to state liquor-enforcement authorities.

19. BLCE's own records establish that at least one BLCE investigation of Pike's was initiated as the result of a complaint from Chief Varacallo.

20. According to information provided to Plaintiffs, Chief Varacallo alleged to liquor-enforcement authorities that Pike's permitted underage persons to frequent the establishment and permitted patrons to remain drinking at Pike's until approximately 3:30 a.m.

21. The latter allegation was substantially similar to an accusation Defendant Sergeant Hartranft had made directly to Matt McCarthy—that Pike's had "people in the bar every night until 3:30," or words to that effect.

22. Township police also investigated alleged drug activity associated with Pike's, including questioning individuals concerning whether Matt McCarthy himself was involved in dealing drugs. Matt McCarthy denies any involvement in drug dealing.

23. BLCE Officer Fetterolf later repeatedly told Matt McCarthy that Pike's had a "drug problem."

24. Township police participated with BLCE in a significant February 2025 enforcement operation at Pike's. During that operation, authorities identified three underage individuals at Pike's, each of whom Pike's had carded and each of whom, upon information and belief, had presented identification purporting to establish that he or she was of legal drinking age.

25. BLCE Officer Fetterolf subsequently told Matt McCarthy that Pike's was fortunate BLCE had not conducted an enforcement operation several weeks earlier because it would have been "way worse" for Pike's, explaining that the earlier operation had not occurred because BLCE lacked sufficient manpower.

26. BLCE also conducted repeated undercover investigations of Pike's and pursued an alleged Responsible Alcohol Management Program ("RAMP") violation that Plaintiffs maintain was unfounded.

27. The scrutiny continued into 2026. On March 16, 2026, Jim McCarthy was personally present when BLCE officers, including BLCE Officer Brutosky, conducted an inspection of Pike's.

28. Upon information and belief, Steam Pub and other similarly situated establishments were not subjected to the same frequency or

intensity of directed police patrols, closing-time checks, governmental referrals, coordinated police/BLCE activity, undercover investigations, and liquor-enforcement scrutiny.

29. Upon information and belief, the disparate treatment of Pike's resulted in whole or in substantial part from communications, requests, influence, and coordination involving the Hoegers, Township officials, Township police personnel, and BLCE personnel.

30. The purpose and effect of this conduct was to subject Pike's and its operators to heightened governmental scrutiny, interfere with Pike's operations, deter customers from patronizing Pike's, damage its reputation and goodwill, and place Pike's at a competitive disadvantage relative to Steam Pub and other similarly situated establishments.

31. The Fourteenth Amendment does not permit governmental power to be intentionally and irrationally deployed against one similarly situated business while others are treated differently.

32. Nor may private competitors conspire or willfully participate in joint action with governmental actors to misuse governmental authority for private economic advantage.

33. Plaintiffs therefore bring this action pursuant to 42 U.S.C. § 1983 and applicable state law to vindicate their constitutional rights and recover damages resulting from Defendants' alleged misconduct.

## PARTIES

34. Plaintiff 2 Guyz LLC is a Pennsylvania limited liability company doing business as Pike's Pub.

35. Pike's is located at 455-457 Second Street Pike, Southampton, PA 18966. Pike's operates pursuant to Pennsylvania Restaurant Liquor License No. R-19779 AP SS, LID No. 100165.

36. Plaintiff Matthew J. McCarthy is an adult individual, an owner of 2 Guyz LLC, and the manager of Pike's. Matt McCarthy has been personally and directly involved in Pike's operations throughout the period relevant to this action and has personally interacted with numerous Township police and BLCE personnel concerning the conduct alleged herein.

37. Plaintiff James F. McCarthy is an adult individual who is an owner of Pike's and 2 Guyz LLC. Jim McCarthy has been personally involved in the operation of Pike's and has personally interacted with

governmental personnel concerning Pike's, including during BLCE inspection activity.

38. Defendant Upper Southampton Township is a Pennsylvania township, political subdivision, and municipal corporation organized and existing under the laws of the Commonwealth of Pennsylvania, which is located in Bucks County, Pennsylvania, with a business address at 939 Street Road, Southampton, PA 18966.

39. The Township acts through its departments, agencies, officials, officers, employees, and agents, including the Upper Southampton Township Police Department ("Township Police Department" or "Police Department"). The Police Department is a department and administrative arm of the Township and is not alleged to be a separate legal entity from the Township. Accordingly, all references herein to the Township include, where applicable, actions taken through the Township Police Department and its officials, officers, employees, and agents acting on behalf of the Township.

40. The Upper Southampton Township Police Department is not named as a separate Defendant because it is an administrative arm of Defendant Township rather than a separate municipal entity.

References throughout this Complaint to the "Township Police Department," "Police Department," or "Department" identify the Township agency through which the challenged police conduct occurred and do not identify a separate Defendant.

41. Defendant Margaret M. Hoeger a/k/a Maggie Hoeger is an adult individual who served as an elected member of the Upper Southampton Township Board of Supervisors during the relevant period until her resignation from the Board in May 2026.

42. During her tenure as a Township Supervisor, Hoeger performed accounting work for and/or maintained a business and financial relationship with Steam Pub. Plaintiffs allege that Hoeger participated in the conduct challenged herein both through the alleged misuse of her governmental position and through her alleged involvement in activities intended to benefit Steam Pub.

43. Defendant Martin Hoeger is Hoeger's husband and owns and operates Steam Pub. Plaintiffs allege that Martin Hoeger participated in, encouraged, or benefited from the alleged efforts to subject Pike's to disparate governmental scrutiny, as more fully described herein.

44. Defendant Steam Pub is a restaurant and bar located in Upper Southampton Township that competes with Pike's for customers, events, food and beverage sales, and other business. Plaintiffs allege that Steam Pub, acting through its owners and agents, participated in or benefited from the conduct challenged herein.

45. Defendant Dominic Varacallo is the Chief of Police of the Upper Southampton Township Police Department. At all relevant times, Chief Varacallo acted under color of state law and within the course and scope of his position with the Township and Police Department.

46. Defendant Michael Kaminski is an Upper Southampton Township police officer who personally participated in police activity concerning Pike's. At all relevant times, Officer Kaminski acted under color of state law and within the course and scope of his employment with the Township and Police Department.

47. Defendant Matthew Bankert is an Upper Southampton Township police officer who participated in investigations concerning Pike's and Matt McCarthy, including investigations concerning alleged drug activity. At all relevant times, Officer Bankert acted under color of

state law and within the course and scope of his employment with the Township and Police Department.

48. Defendant Scott Hartranft is a Sergeant with the Upper Southampton Township Police Department who personally participated in police activity concerning Pike's and accused Pike's of routinely permitting patrons to remain in the establishment until approximately 3:30 a.m. At all relevant times, Sergeant Hartranft acted under color of state law and within the course and scope of his employment with the Township and Police Department.

49. Defendant Francis Brutosky is an officer employed by the Pennsylvania State Police Bureau of Liquor Control Enforcement ("BLCE") who repeatedly interacted with Plaintiffs and participated in inspection and enforcement activity concerning Pike's. At all relevant times, Officer Brutosky acted under color of state law and within the course and scope of his employment with BLCE.

50. Defendant Brian C. Fetterolf is an officer employed by BLCE who participated in and/or directed enforcement activity concerning Pike's, including the February 2025 enforcement activity described

below. At all relevant times, Officer Fetterolf acted under color of state law and within the course and scope of his employment with BLCE.

51. Defendant J. Blaker, Badge No. 9480, is an officer employed by BLCE who conducted repeated undercover and investigative activity concerning Pike's. At all relevant times, Officer Blaker acted under color of state law and within the course and scope of his employment with BLCE.

52. Defendant M. Roskos, Badge No. 9346, is an officer employed by BLCE who conducted undercover and enforcement activity concerning Pike's and participated in the events leading to the February 2025 enforcement operation. At all relevant times, Officer Roskos acted under color of state law and within the course and scope of his employment with BLCE.

53. Defendants John Does 1-5 are presently unidentified Township officials, supervisors, police officers, or employees who participated in, directed, approved, facilitated, or knowingly acquiesced in the selective enforcement and other conduct alleged herein. At all relevant times, John Does 1-5 acted under color of state law. Their

identities and precise roles are presently unknown to Plaintiffs and will be determined through discovery.

54. Defendants John Does 6-10 are presently unidentified BLCE officials, supervisors, or officers who participated in, directed, approved, facilitated, or knowingly acquiesced in the selective enforcement and other conduct alleged herein. At all relevant times, John Does 6-10 acted under color of state law. Their identities and precise roles are presently unknown to Plaintiffs and will be determined through discovery.

55. Defendants Margaret M. Hoeger, Martin Hoeger, and Steam Pub are alleged to have acted jointly or in concert with governmental actors in connection with the constitutional violations alleged herein. Plaintiffs allege that these private Defendants participated in the challenged conduct through the communications, coordination, and other actions described in this Complaint.

56. At all relevant times, the individual governmental Defendants acted under color of state law in connection with the challenged conduct. Plaintiffs seek to hold each individual Defendant liable for his or her own participation in the alleged constitutional

violations, including, where supported by the facts, through personal direction, participation, or knowing involvement in joint action.

57. Each individual governmental Defendant is sued in his or her individual capacity for damages. To the extent applicable, Plaintiffs also seek prospective declaratory and injunctive relief against the appropriate governmental Defendants in their official capacities. The Township is sued directly for municipal liability under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

58. This action arises under the United States Constitution and laws of the United States, including the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 1988. Plaintiffs also seek attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

59. This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

60. This Court has supplemental jurisdiction over Plaintiffs' related Pennsylvania state law claims pursuant to 28 U.S.C. § 1367, because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

61. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants reside in this District and all Defendants reside in the Commonwealth of Pennsylvania, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Upper Southampton Township, Bucks County, Pennsylvania.

## FACTUAL ALLEGATIONS

### A. Pike's and Steam Pub Are Competing Upper Southampton Businesses.

62. Pike's is an established restaurant and bar operating in Upper Southampton Township. Pike's operates pursuant to Pennsylvania Restaurant Liquor License No. R-19779 AP SS, LID No. 100165.

63. The McCarthys have been involved in the ownership, management, and/or operation of Pike's during the period relevant to this action.

64. Pike's serves food and alcoholic beverages, hosts events, and depends upon customers from Upper Southampton Township and the surrounding area.

65. The McCarthys acquired Pike's on or about March 4, 2020.

66. Before the McCarthys acquired Pike's, the establishment had not enjoyed the same level of commercial success that it subsequently achieved under the McCarthys' ownership and operation.

67. Steam Pub is another restaurant and bar operating in Upper Southampton Township.

68. Steam Pub is located approximately 0.3 miles from Pike's and, before the McCarthys' acquisition and development of Pike's, had established a substantial presence in the local restaurant and pub market.

69. Following the McCarthys' acquisition of Pike's, Pike's business substantially grew, and the two establishments increasingly competed for customers, events, food and beverage sales, and discretionary entertainment spending.

70. As Pike's business grew, customers who otherwise patronized or previously had patronized Steam Pub increasingly patronized Pike's, thereby intensifying the direct commercial competition between the two establishments.

71. Because Martin Hoeger owned and operated Steam Pub and Hoeger performed accounting work for and/or maintained a business

and financial relationship with Steam Pub, both Hoegers possessed a direct financial interest in Steam Pub's commercial success and a corresponding financial interest in limiting competitive losses to Pike's.

72. Accordingly, the direct and increasing competition between Pike's and Steam Pub provided the Hoegers with a concrete economic motive to disadvantage Pike's and benefit Steam Pub.

73. Both Pike's and Steam Pub: (1) operate within the same municipality; (2) are subject to the jurisdiction of the Upper Southampton Township Police Department; (3) are subject to Township code, zoning, and fire regulation; and (4) operate within Pennsylvania's liquor-licensing and liquor-enforcement framework. Both establishments also serve alcoholic beverages to the public and compete for substantially overlapping customers and business opportunities.

74. They therefore are similarly situated in material respects relevant to the police and regulatory conduct at issue in this action, including the enforcement of liquor laws, closing-time requirements, underage-drinking restrictions, and other regulations applicable to restaurant and bar operations.

75. During the relevant period, however, Hoeger simultaneously served as an elected Township Supervisor and performed accounting work for and/or maintained a business and financial relationship with Steam Pub, which was owned and operated by her husband.

76. Steam Pub also maintained a longstanding and unusually close relationship with Upper Southampton Township government.

77. For years, the Upper Southampton Township Board of Supervisors regularly held weekly Township meetings at Steam Pub.

78. Those meetings brought Township Supervisors, officials, and personnel to Steam Pub on a regular and recurring basis, providing recurring opportunities for interaction between Steam Pub's ownership and Township decisionmakers.

79. The relationship extended to the Township Police Department.

80. Defendant Officer Bankert told Matt McCarthy that Upper Southampton Police had "had a good relationship with Marty," referring to Martin Hoeger, "for about 10 years," or words to that effect.

81. Thus, Steam Pub was not simply another restaurant and bar operating within the Township. Its owner had a longstanding

relationship with Township police, Hoeger served on the Township's governing body, and Township officials regularly gathered at the establishment.

82. These circumstances provide relevant context for Plaintiffs' allegations concerning the access and influence available to the Hoegers, the Hoegers' economic interest in Steam Pub's success, and the materially different governmental treatment afforded to Steam Pub and Pike's.

83. Notwithstanding the substantial similarities between the two establishments, Pike's was subjected to materially more frequent and intensive police and liquor-enforcement scrutiny than Steam Pub, including directed patrols, closing-time investigations, regulatory referrals, undercover operations, and coordinated enforcement activity, as detailed below.

84. Plaintiffs further allege that the combination of direct commercial competition, the Hoegers' financial interests, their longstanding relationships with Township officials, and the disparate enforcement activity directed at Pike's provides relevant circumstantial

evidence concerning the alleged improper purpose and coordination underlying Defendants' conduct.

**B. Hoeger's Simultaneous Public Office and Relationship with Steam Pub.**

85. Hoeger served as an elected member of the Upper Southampton Township Board of Supervisors during the period relevant to this action.

86. Hoeger remained a Township Supervisor until May 2026, when she resigned from the Board.

87. During substantially all of the Township police and regulatory activity giving rise to this action, Hoeger therefore occupied a position of governmental authority within Upper Southampton Township.

88. Upper Southampton Township is a Pennsylvania township of the second class governed by a five-member elected Board of Supervisors.

89. Under Pennsylvania's Second Class Township Code, the Board of Supervisors is charged with the general governance of the Township and exercises legislative, executive, and administrative authority over Township affairs. *See* 53 P.S. § 65607.

90. The Board's statutory responsibilities extend specifically to the Township Police Department. Section 1902 of the Second Class Township Code provides that the Board of Supervisors "shall provide for the organization and supervision" of the Township police force and determine the number and compensation of its police officers. *See* 53 P.S. § 66902.

91. The Board therefore possessed governmental supervisory authority and responsibility concerning the Township Police Department during the period relevant to this action.

92. As one of the five elected members of that Board, Hoeger occupied an official position on the Township governing body charged by Pennsylvania law with responsibility for the organization and supervision of the police force headed by Defendant Chief Dominic Varacallo.

93. Hoeger's elected position thus afforded her official governmental status, access to Township leadership, and opportunities to communicate with Chief Varacallo, police leadership, Township administrators, and other Township personnel concerning police operations and enforcement matters.

94. Thus, Hoeger's elected position placed her on the governing body possessing statutory supervisory responsibility over the Police Department and afforded her official governmental access to, influence with, and opportunities to communicate with Chief Varacallo, police leadership, Township administrators, and other Township personnel concerning police operations and enforcement matters.

95. Upper Southampton Township itself further identifies the Board of Supervisors as possessing authority to approve the hiring and termination of Township employees, further demonstrating the Board's governmental authority over Township personnel and operations.

96. Accordingly, any use by Hoeger of her position as Township Supervisor to request, encourage, facilitate, influence, or cause police activity concerning Pike's occurred against the backdrop of her membership on the governmental body statutorily responsible for organization and supervision of the Township police force.

97. At the same time, Hoeger performed accounting work for and/or maintained a business and financial relationship with Steam Pub.

98. Steam Pub was owned and operated by Hoeger's husband, Martin Hoeger.

99. Steam Pub directly competed with Pike's.

100. Upon information and belief, while serving as a Township Supervisor, Hoeger communicated with Township officials, Township police personnel, and/or other governmental actors concerning Pike's and its owners and operations.

101. Upon information and belief, Hoeger used the access, influence, authority, and opportunities afforded by her public office and her membership on the Township governing body statutorily responsible for the organization and supervision of the Township police force to encourage, request, facilitate, or influence heightened governmental scrutiny of Pike's.

102. Upon information and belief, Hoeger requested, encouraged, and/or caused the Township Police Department and/or Township officials to review, investigate, monitor, or otherwise direct governmental attention toward Pike's.

103. Upon information and belief, Hoeger made those communications while simultaneously serving as an elected Township

Supervisor and maintaining a business and financial relationship with Steam Pub, Pike's direct competitor.

104. Hoeger's alleged involvement extended beyond merely possessing governmental access and a potential economic motive and included affirmative efforts to encourage or facilitate the scrutiny directed at Pike's, as more fully described herein.

105. On one occasion, approximately six individuals informed Matt McCarthy that they had been turned away from Steam Pub after its security personnel questioned their out-of-state identification cards. The individuals reported that a woman associated with Steam Pub, whom Matt McCarthy believed from their description to be Hoeger, stated in substance that if they wanted to be served while underage, they should go to Pike's because Pike's would serve them.

106. Upon information and belief, Martin Hoeger and/or Steam Pub participated in, encouraged, supplied information for, or benefited from those efforts.

107. The heightened governmental scrutiny alleged herein included Township police monitoring and enforcement activity, referrals

and communications with state liquor-enforcement authorities, and coordinated activity between Township police and BLCE.

108. BLCE's own records establish that, while Hoeger remained a Township Supervisor, Chief Varacallo made at least one complaint concerning Pike's directly to BLCE that resulted in a BLCE investigation.

109. Specifically, BLCE records state that an investigation was initiated on February 3, 2025, "as a result of a complaint received from Chief Dominic Varacallo," concerning alleged underage patrons and patrons allegedly remaining at Pike's and consuming alcohol until approximately 3:30 a.m. *See* Pennsylvania State Police, Bureau of Liquor Control Enforcement Pre-Hearing Memorandum, Citation No. 25-0363, attached hereto as Exhibit A.

110. Upon information and belief, the Township Police Department did not routinely subject other similarly situated licensed establishments, including Steam Pub, to comparable referrals to BLCE arising from allegations of underage drinking, after-hours activity, or other liquor-related violations.

111. The frequency and nature of the referrals and communications concerning Pike's were materially different from the manner in which Township police addressed comparable incidents involving other licensed establishments.

112. In particular, Chief Varacallo's affirmative referral of Pike's to BLCE, considered together with the directed patrols, closing-time checks, and other police activity described herein, forms part of the alleged pattern of heightened scrutiny directed at Pike's.

113. Plaintiffs presently lack access to the Township's records concerning prior referrals, complaints, or communications by Township police personnel to BLCE concerning other licensed establishments. Such information is principally within the possession and control of the Township and/or BLCE and will be the subject of discovery.

114. The documentary record thus confirms that, during Hoeger's tenure on the Board of Supervisors, the Township's Chief of Police was communicating allegations concerning Pike's directly to state liquor-enforcement authorities and that those communications resulted in additional governmental investigation of Pike's.

115. Hoeger's resignation from the Board in May 2026 occurred after the directed Township police activity, Chief Varacallo's BLCE referral, the February 2025 joint Township police/BLCE operation, and much of the other governmental activity challenged herein.

116. The combination of Hoeger's governmental position, her financial relationship with Pike's direct competitor, her alleged communications concerning Pike's, and the documented pattern of enforcement activity provides circumstantial support for Plaintiffs' claims that governmental authority was improperly used to disadvantage Pike's.

### C. Township Police Subject Pike's to Directed and Officer-Initiated Scrutiny.

117. Since approximately 2020, Pike's and the McCarthys have experienced repeated contacts with Township police.

118. Some involved legitimate requests for police assistance, medical emergencies, crimes committed against Pike's or its owners, or misconduct by third parties. For example, Township police records document responses to medical emergencies, patron disturbances, and crimes in which Pike's or Matt McCarthy was the victim.

119. Other activity involved affirmative police monitoring, directed patrols, closing-time checks, allegations of after-hours activity, drug investigations, and regulatory referrals initiated by Township police rather than responses to requests for police assistance from Pike's.

120. The frequency, nature, and circumstances of certain officer-initiated activities caused Matt McCarthy to question whether Township police were subjecting Pike's and its owners to scrutiny beyond that ordinarily directed at similarly situated establishments.

121. During this period of heightened police scrutiny, Matt McCarthy discovered an Apple AirTag concealed on or attached to his personal vehicle that Matt McCarthy had not placed there and that was capable of tracking the location and movements of his vehicle.

122. At all relevant times, Matt McCarthy personally owned the vehicle and was its exclusive user. The vehicle was his personal property, was not owned by Pike's, and was used by Matt McCarthy for personal transportation.

123. Based upon the timing and circumstances surrounding the discovery of the AirTag, the ongoing pattern of police surveillance and

monitoring directed at Matt McCarthy and Pike's, and the other conduct alleged herein, Plaintiffs believe and therefore aver, upon information and belief, that the AirTag was placed on Matt McCarthy's vehicle by a member of the Upper Southampton Township Police Department for the purpose of monitoring or tracking Matt McCarthy's movements.

124. After discovering the AirTag, Matt McCarthy brought the device to the Upper Southampton Township Police Department and reported it to Officer Daniel Lisa. Matt McCarthy advised Officer Lisa that he had discovered the tracking device on his vehicle and sought police assistance concerning its placement there.

125. Officer Lisa documented the discovery of the AirTag and obtained its serial number, which could potentially be used to identify the individual or account associated with the tracking device.

126. Notwithstanding the existence of that potential investigative lead, Officer Lisa did not undertake any further investigation to determine who purchased, registered, installed, or used the AirTag. Instead, Officer Lisa closed the incident without further action.

127. Rather than investigate who had placed the tracking device on Matt McCarthy's vehicle, attempt to identify its owner or source, or otherwise address Matt McCarthy's concern that someone was tracking his movements, Officer Lisa advised Matt McCarthy, in substance, that there was nothing the Police Department could do.

128. Matt McCarthy's wife subsequently contacted the Police Department because she was concerned that the unknown tracking of Matt McCarthy's vehicle presented a safety risk to Matt McCarthy and their family. She likewise was advised, in substance, that there was nothing the Police Department could do.

129. Plaintiffs believe that the Department's refusal to investigate the AirTag was not coincidental. Rather, upon information and belief, the Department declined to investigate because Officer Lisa and/or other Township police personnel knew the circumstances under which the AirTag had been placed on Matt McCarthy's vehicle.

130. The discovery of a tracking device on Matt McCarthy's personal vehicle, together with the Department's refusal to investigate its origin, occurred against the backdrop of the directed patrols, repeated surveillance, officer-initiated closing checks, drug-related

inquiries, and other extraordinary police scrutiny directed at Matt McCarthy and Pike's as alleged herein.

131. These circumstances further support Plaintiffs' allegation that the governmental scrutiny directed at Pike's extended beyond ordinary law-enforcement activity concerning the establishment and included efforts to monitor Matt McCarthy personally.

132. On April 13, 2024, Township police responded to an incident at Pike's involving a patron named John Scott Isaac. Defendant Officer Kaminski was the primary responding officer. *See* Upper Southampton Township Police Department Incident Report No. 73-24-04113, attached hereto as Exhibit B.

133. The encounter escalated into a physical confrontation between Isaac and Township police and resulted in Isaac's arrest. Township police records specifically state that Chief Varacallo was "immediately advised" of the incident. *See id.*

134. Thus, no later than April 2024, the Township's Chief of Police had direct command-level awareness of incidents involving Pike's.

135. On July 7, 2024, Officer Kaminski was in the area of Pike's conducting what his own police report expressly characterized as a "directed patrol" of the shopping center. This was not simply a response to a request for police assistance from Pike's. *See* Upper Southampton Township Police Department Incident Report No. 73-24-07252, attached hereto as Exhibit C.

136. During the directed patrol, Officer Kaminski observed individuals behind Pike's, detected the odor of marijuana, and observed fireworks. *See id.*

137. Officer Kaminski contacted a Pike's employee and advised that the incident would be documented and forwarded to the Township Fire Marshal and Pennsylvania liquor authorities. *See id.*

138. Matt McCarthy subsequently spoke directly with Officer Kaminski. Officer Kaminski attributed the individuals in the area to Pike's and advised Matt McCarthy that they were "obviously his customers," or words to that effect.

139. On another occasion in or around the winter of 2024, after Pike's had closed for the evening, Matt McCarthy was working in his office at Pike's at approximately 3:30 a.m.

140. While seated in his office, Matt McCarthy observed on Pike's surveillance cameras an on-duty Upper Southampton Township police officer outside the establishment shining a flashlight on and inspecting Matt McCarthy's personal vehicle.

141. The officer was not responding to a call for police assistance from Pike's, and Matt McCarthy was not aware of any reported criminal activity or other incident involving his vehicle that would have prompted the officer's inspection.

142. After observing the officer on the surveillance camera, Matt McCarthy went outside and asked the officer whether he could assist him.

143. Because it was winter and cold outside, Matt McCarthy initially had his hands inside the pockets of his sweater. The officer instructed Matt McCarthy to show his hands, and Matt McCarthy immediately complied, apologized, and explained that he understood the safety concerns associated with the officer's work.

144. Matt McCarthy then asked the officer why he had been inspecting Matt McCarthy's vehicle.

145. The officer responded, in substance, that he had worked for the Upper Southampton Township Police Department for approximately four years and had frequently observed individuals passed out in vehicles behind Pike's. The officer stated that he was checking Matt McCarthy's vehicle because, given the winter weather conditions, a person sleeping inside a vehicle could die from exposure.

146. Matt McCarthy observed no person inside his vehicle and was aware of no circumstance suggesting that anyone was sleeping, unconscious, or otherwise in distress inside the vehicle.

147. Based upon what Matt McCarthy personally observed, including the officer's focus on Matt McCarthy's vehicle and the absence of any person apparently inside or in distress, Matt McCarthy believed that the officer was inspecting his vehicle rather than conducting a welfare check for an individual who might have been sleeping inside it.

148. Matt McCarthy and the officer ultimately concluded the interaction amicably. Matt McCarthy told the officer that he supported law enforcement and again acknowledged the officer's safety concerns.

149. Matt McCarthy did not obtain the officer's name or badge number at the time. Matt McCarthy recalls that the officer appeared to

be approximately thirty years old, approximately six feet tall, physically fit, and had reddish-blond hair.

150. During the interaction, the officer told Matt McCarthy that he had been employed by the Upper Southampton Township Police Department for approximately four years. Based upon the approximate date of the encounter and the officer's statement, Matt McCarthy understood that the officer had joined the Department in or around 2020—the same general time that the McCarthys acquired Pike's on March 4, 2020.

151. The identity of the officer is presently unknown to Plaintiffs. Plaintiffs therefore identify him at this stage as a John Doe Township Police Officer and will seek to determine his identity through discovery, including Police Department personnel records, duty rosters, patrol assignments, dispatch and CAD records, and other records identifying the officers working in the vicinity of Pike's during the relevant period.

152. This late-night inspection of Matt McCarthy's personal vehicle provides an additional example of Township police scrutiny extending beyond responses to calls for service at Pike's and

encompassing affirmative monitoring of Matt McCarthy and his personal property.

153. The officer's inspection of Matt McCarthy's vehicle, at a time when Pike's was closed and Matt McCarthy was working inside, afforded the officer an opportunity to approach and inspect the vehicle.

154. Considered together with the directed patrols, officer-initiated closing checks, investigation into whether Matt McCarthy personally was involved in illegal drug activity, the AirTag discovered on Matt McCarthy's vehicle, and the other conduct alleged herein, the incident further supports Plaintiffs' allegation that Township police scrutiny was directed not merely at Pike's as a licensed establishment, but personally at Matt McCarthy.

155. On one occasion, Matt McCarthy personally visited the Upper Southampton Township Police Department and requested to speak with Chief Varacallo concerning what Matt McCarthy believed was unfair and excessive police treatment of Pike's. Department personnel advised that the Chief was at lunch. Matt McCarthy left his name, identified himself as being from Pike's, and explained that he

wanted to discuss how Pike's was being treated. No meeting with the Chief occurred during that visit.

156. On another occasion, Sergeant Hartranft confronted Matt McCarthy at approximately 12:45 a.m. while Matt McCarthy was assisting with an incident behind Pike's during lawful operating hours.

157. Without prompting, Sergeant Hartranft accused Matt McCarthy and Pike's of having "people in the bar every night until 3:30," or words to that effect.

158. Matt McCarthy challenged the accusation. Other officers present then told Sergeant Hartranft, "Ok Scott, let's get you out of here," or words to that effect, and Hartranft left.

159. Sergeant Hartranft's accusation is significant because Chief Varacallo subsequently communicated a substantially similar allegation to state liquor-enforcement authorities concerning Pike's allegedly permitting patrons to remain and consume alcohol until approximately 3:30 a.m.

160. BLCE's own records state that an investigation was initiated on February 3, 2025, "as a result of a complaint received from Chief Dominic Varacallo," who alleged, among other things, that patrons

remained at Pike's consuming alcoholic beverages until approximately 3:30 a.m. *See* Ex. A.

161. Upon information and belief, the repeated 3:30 a.m. allegation reflected information and accusations concerning Pike's that were being communicated and circulated among Township police personnel and thereafter transmitted to BLCE.

162. On another occasion, Township Officer Brandon Drakeley obtained or reviewed video depicting individuals inside Pike's at approximately 2:37 a.m. and transmitted the video and/or information concerning it to state liquor-enforcement authorities.

163. Although several individuals remained inside Pike's at approximately 2:37 a.m., Pike's was closed for business and was not serving alcoholic beverages. Matt McCarthy and another bartender were actively cleaning the establishment and performing their closing duties. The mere presence of individuals inside Pike's after 2:00 a.m. did not establish that Pike's was selling or serving alcohol after lawful serving hours.

164. Officer Drakeley is not presently named as a Defendant, but his conduct further demonstrates direct communication between Township police and liquor-enforcement authorities concerning Pike's.

165. On August 23, 2024, a Township police officer affirmatively drove to the rear of Pike's for the stated purpose of determining "if the bar was closed." *See* Upper Southampton Township Police Department Incident Report No. 73-24-08936, attached hereto as Exhibit D.

166. Approximately fifteen individuals were encountered outside and ordered to leave. *See id.*

167. The report did not identify an offense committed by Pike's as the reason for the officer's initial presence. *See id.*

168. Instead, the officer affirmatively went to Pike's to determine whether the establishment had closed. *See id.*

169. Township police records demonstrate that this type of regulatory scrutiny continued thereafter.

170. On June 29, 2025, officers responded to a complaint that Pike's was setting up a tent for an outdoor event. Although the event was a charitable fundraiser to purchase school supplies for a school-supplies drive operated by the Family Service Association of Bucks

County, police advised the complainant that the incident would be documented and potentially referred to the Pennsylvania Liquor Control Board ("PLCB") and/or Upper Southampton Township Code Enforcement. The report concludes: "No further action." *See* Upper Southampton Township Police Department Incident Report No. 73-25-06396, attached hereto as Exhibit E.

171. By contrast, Township police records also document numerous occasions on which officers responded to legitimate calls for service at Pike's, addressed the particular third-party conduct at issue, and closed the matter without attributing wrongdoing to Pike's.

172. For example, on August 2, 2025, Officer Kaminski encountered a group arguing outside Pike's while on patrol. Officers dispersed the group, and Officer Kaminski's report concluded, "Nothing further." *See* Upper Southampton Township Police Department Incident Report No. 73-25-07508, attached hereto as Exhibit F.

173. Similarly, on August 15, 2025, officers responded to a reported fight at Pike's but found no active fight, received conflicting accounts, identified no reported assault, and documented that Pike's bartender requested that the individuals involved leave the

establishment, which they did without incident. The matter was closed with no further action. *See* Upper Southampton Township Police Department Incident Report No. 73-25-07924, attached hereto as Exhibit G.

174. Township police records further demonstrate that Pike's and the McCarthys themselves sought and received ordinary police assistance when crimes occurred at the establishment. In September 2025, for example, Matt McCarthy reported the theft of money from Pike's, cooperated with the resulting investigation, and was identified in the police report as the victim. *See* Upper Southampton Township Police Department Incident Report No. 73-25-08925, attached hereto as Exhibit H.

175. These ordinary police responses are not the subject of Plaintiffs' constitutional claims. Rather, Plaintiffs challenge the separate pattern of affirmative monitoring, directed and officer-initiated scrutiny, after-hours surveillance, investigation, regulatory referrals, and coordinated enforcement activity directed at Pike's and its owners.

176. The frequency, intensity, and cumulative nature of this officer-initiated activity, when compared with the treatment of similarly

situated establishments, supports the claim that Pike's was subjected to selective governmental scrutiny rather than ordinary and consistently applied law enforcement.

**D. Township Police Investigate Alleged Drug Activity Associated with Pike's and Matt McCarthy.**

177. Township police also focused on allegations of drug activity in and around Pike's.

178. On one occasion, Defendant Officer Bankert investigated suspected drug activity behind Pike's involving Dalton Halston and Brian Finn.

179. During that investigation, Officer Bankert questioned Halston and Finn concerning whether Matt McCarthy was personally involved in dealing drugs. Matt McCarthy unequivocally denies having engaged in any drug dealing.

180. Officer Bankert's questioning demonstrates that Township police were not merely investigating particular third parties for alleged drug activity, but also inquired whether Pike's owner and manager himself was involved in illegal drug activity.

181. During his interactions with Matt McCarthy, Officer Bankert also stated that Upper Southampton Police had maintained a

"good relationship with Marty"—referring to Martin Hoeger—"for about 10 years," or words to that effect.

182. Thus, the same officer who acknowledged the Police Department's longstanding relationship with the owner of Pike's direct competitor also participated in an investigation that included questioning whether Matt McCarthy was involved in illegal drug activity.

183. On another occasion, Township Officer Robert Ungurean reported that he was patrolling the area because he had been advised that it was a "problem area," or words to that effect.

184. Officer Ungurean is not presently named as a Defendant, but his report provides further evidence that Pike's and/or its immediate vicinity had been identified within the Police Department as an area warranting heightened police attention.

185. The area identified as a "problem area" is located approximately 0.3 miles from Steam Pub along Second Street Pike, such that the two establishments operated in close geographic proximity and shared at least some of the surrounding community and law-enforcement conditions.

186. On or about October 9, 2022, a shooting occurred in the parking lot of Steam Pub in which two individuals were shot and killed.

187. By contrast, Plaintiffs are unaware of any shooting having occurred at Pike's during their ownership and operation of the establishment.

188. The October 2022 shooting is relevant to Plaintiffs' comparison of the law-enforcement attention directed at Pike's and Steam Pub, particularly insofar as Defendants relied upon criminal activity in the surrounding area as a justification for heightened scrutiny of Pike's.

189. The October 2022 shooting incident also is relevant because the Township's characterization of the area surrounding Pike's as a "problem area" was applied as a justification for heightened police attention toward Pike's despite serious third-party incidents having occurred at or immediately adjacent to its direct competitor only approximately 0.3 miles away.

190. The disparate use of third-party incidents and surrounding-area conditions as a basis for heightened attention toward Pike's further supports Plaintiffs' allegation that ostensibly neutral

enforcement considerations were not applied consistently to similarly situated establishments.

191. Upon information and belief, notwithstanding serious criminal incidents occurring at or near Steam Pub, Pike's was subjected to more frequent and intensive officer-initiated monitoring, closing-time checks, regulatory referrals, and coordinated enforcement activity. Plaintiffs allege that this disparity warrants consideration in determining whether law-enforcement concerns were applied consistently to the two establishments.

192. The Township police inquiries concerning alleged drug activity at or associated with Pike's are particularly significant because BLCE Officer Fetterolf subsequently told Matt McCarthy that Pike's had a "drug problem."

193. Officer Fetterolf repeated the accusation when Matt McCarthy sought to discuss its basis, again telling him, "You have a drug problem," or words to that effect.

194. Plaintiffs deny that Pike's operated, maintained, or knowingly permitted a "drug problem," and the police and BLCE

records presently available to Plaintiffs do not establish that Matt McCarthy engaged in drug dealing.

195. To Plaintiffs' knowledge, there have been no drug-related arrests, criminal charges, or citations against Pike's or Matt McCarthy, and no illegal drugs have been recovered from Pike's. Nor has Matt McCarthy ever been arrested, charged, or cited for selling, distributing, or possessing illegal drugs in connection with Pike's.

196. Notwithstanding the absence of such enforcement action or recovered drugs, Township police investigated whether Matt McCarthy personally was involved in drug dealing, and BLCE Officer Fetterolf subsequently and repeatedly accused Pike's of having a "drug problem."

197. The absence of drug-related arrests, charges, citations, or recovered contraband involving Pike's or Matt McCarthy further demonstrates the lack of an evidentiary basis for the repeated governmental accusations concerning an alleged "drug problem."

198. The recurrence of drug-related allegations first in Township police inquiries and later in statements by a BLCE officer is consistent with the broader pattern alleged herein in which allegations concerning

Pike's circulated between Township police and state liquor-enforcement personnel.

199. Upon information and belief, allegations concerning drug activity at Pike's and/or Matt McCarthy's supposed involvement in such activity were communicated among Township police personnel, BLCE personnel, and/or other persons and were used to initiate, justify, or reinforce heightened governmental scrutiny of Pike's.

200. The repeated focus on alleged drug activity, including inquiries concerning Matt McCarthy personally, should be considered together with the directed patrols, closing-time checks, liquor-enforcement referrals, and other conduct described herein in evaluating whether Pike's was intentionally subjected to materially different governmental treatment than similarly situated establishments.

**E. Unsubstantiated and Third-Party Incidents Were Repeatedly Associated with Pike's.**

201. The Township and Police Department repeatedly received complaints concerning Pike's that either proved unfounded or did not establish wrongdoing by Pike's or the McCarthys. Other police contacts arose from medical emergencies, misconduct by third parties, or incidents in which Pike's or its owners sought police assistance.

202. On December 26, 2024, an individual identifying himself only as "Tom" called Township police and alleged excessive noise and suspected underage drinking at Pike's. *See* Upper Southampton Township Police Department Incident Report No. 73-24-13758, attached hereto as Exhibit I.

203. The caller refused to provide additional identifying information and terminated the call. Police nevertheless responded. *See id.*

204. Upon arrival, officers found the premises appeared to be in order and observed no excessive noise. The responding officer specifically reported: "All appeared in order with no excessive noise." *See id.*

205. Thus, although the complaint generated another police report associated with Pike's, the responding officer's own observations did not substantiate the reported conditions.

206. On June 29, 2025, Township police responded to a complaint by Jennifer Dougherty concerning an outdoor event being prepared at Pike's. *See* Ex. E.

207. Upon information and belief, Jennifer Dougherty, who complained to Township police about Pike's June 29, 2025 charitable fundraiser, had previously patronized Steam Pub. Facebook connections suggest that Dougherty may have a personal relationship with Defendant Hoeger.

208. The event was "Grace's Family Quizzo," a charitable fundraiser intended to collect school supplies for the Family Service Association of Bucks County. *See id.*

209. Grace's Family Quizzo is organized by Matt McCarthy's daughter. By age sixteen, she had raised more than $35,000 for charitable causes, in substantial part through events such as Grace's Family Quizzo. At age eleven, she received the 21st Annual Susan B. Altamari Community Service Award and was the first child to receive the award after its first twenty recipients had been adults.

210. The charitable and community-oriented nature of the event provides additional context for Plaintiffs' allegation that even benign activity at Pike's generated police documentation and the prospect of referral to liquor and code-enforcement authorities. The police report

itself confirms that the June 29, 2025 event was a charitable fundraiser and that the matter concluded with "No further action." *See id.*

211. Police nevertheless documented the complaint and advised that the matter could be referred to the PLCB and/or Township Code Enforcement. The report reflects no enforcement action and concludes: "No further action." *See id.*

212. Other police records associated with Pike's concern medical emergencies, disputes between individual patrons, crimes committed against Pike's or the McCarthys, or other events in which Pike's or its owners committed no offense.

213. For example, on October 21, 2024, Township police responded to Pike's concerning an intoxicated individual who required medical assistance. Officer Bankert monitored the individual until emergency medical personnel arrived and transported him, and the incident was closed with no further action. *See* Upper Southampton Township Police Department Incident Report No. 73-24-11176, attached hereto as Exhibit J.

214. Similarly, on November 25, 2024, Township police responded to a disturbance involving patrons at Pike's. The complainant declined

to pursue the matter, denied being injured, and left without further incident. *See* Upper Southampton Township Police Department Incident Report No. 73-24-12545, attached hereto as Exhibit K.

215. Township police records from December 13 and December 15, 2024 likewise document medical calls involving, respectively, a patron who sustained a facial laceration after falling and an individual who fainted. Both matters were closed with no further action. *See* Upper Southampton Township Police Department Incident Reports Nos. 73-24-13261 and 73-24-13312, attached hereto as Exhibits L and M, respectively.

216. On September 8, 2025, for example, Matt McCarthy himself was the victim of a theft at Pike's. *See* Ex. H.

217. Matt McCarthy cooperated with police, supplied surveillance information, identified the suspect, and later contacted police when the suspect returned. The suspect was arrested and ultimately pleaded guilty and was ordered to pay restitution. The incident therefore involved criminal conduct directed against Pike's rather than criminal conduct by Pike's or the McCarthys. *See id.*

218. When Matt McCarthy visited the Police Department to report the theft of cash from Pike's, the receptionist initially advised that officers were unavailable to assist him. After Matt McCarthy requested the receptionist's name and began documenting the interaction, the receptionist became more responsive, and Officer Robert Ungurean contacted Matt McCarthy shortly thereafter. Matt McCarthy does not recall every detail of the exchange but personally experienced the initial difficulty obtaining assistance.

219. On August 10, 2025, at approximately 2:09 a.m., Township Officer Ethan Dilcherd responded to Pike's for a medical emergency involving a twenty-two-year-old woman who was reportedly vomiting and had become unresponsive outside the establishment. *See* Upper Southampton Township Police Department Incident Report No. 73-25-07762, attached hereto as Exhibit N.

220. In his report, Officer Dilcherd stated that, upon arriving at the scene, the woman "was surrounded by about 30 patrons who all appeared highly intoxicated." Officer Dilcherd further reported that the woman herself appeared highly intoxicated and stated that she had

consumed three drinks and smoked marijuana before coming to Pike's. *See id.*

221. The report does not identify the approximately thirty individuals, establish that each individual had been inside Pike's or consumed alcohol there, or identify any investigation establishing that Pike's had served alcohol to any visibly intoxicated person. Nevertheless, Officer Dilcherd characterized the entire group as Pike's "patrons" who "all appeared highly intoxicated." *See id.*

222. The August 10, 2025 report is further evidence of the manner in which Township police attributed conduct occurring in the common areas outside Pike's to the establishment and broadly characterized individuals congregating near Pike's in a manner that portrayed Pike's as a source of alcohol-related problems.

223. Despite Officer Dilcherd's characterization of approximately thirty people as highly intoxicated, the incident resulted in no citation, charge, or other enforcement action against Pike's or the McCarthys, and the Police Department closed the matter with "No Further Action." *See id.*

224. In December 2025, Township police again associated an incident with Pike's after an intoxicated patron damaged an Uber driver's vehicle outside the establishment. *See* Upper Southampton Township Police Department Incident Report No. 73-25-12678, attached hereto as Exhibit O.

225. The police report classified the incident as "Alcohol Related." Pike's and the McCarthys committed no offense in connection with that incident. Rather, the alleged misconduct involved the individual patron. *See id.*

226. The police records therefore demonstrate that the mere existence of an incident report associated with Pike's does not establish misconduct by Pike's or the McCarthys. In numerous instances, Pike's was simply the location of third-party conduct, Pike's or a McCarthy was the victim or complainant, police were summoned to provide assistance, or the reported complaint was not substantiated.

227. The distinction is material because Plaintiffs allege that the governmental scrutiny directed at Pike's was reinforced, at least in part, by treating the frequency of police contacts associated with the

establishment as indicative of problems at Pike's without adequately distinguishing the nature and outcome of those contacts.

228. Upon information and belief, however, Township officials and police personnel considered the frequency and nature of incidents associated with Pike's in determining whether to undertake additional monitoring, investigations, or regulatory referrals. Plaintiffs allege that such consideration did not consistently distinguish between alleged violations by Pike's and incidents in which Pike's was merely the location of third-party conduct, the complainant, the victim, or the recipient of police assistance.

229. Matt McCarthy has personally identified statements in Township police reports concerning Pike's that he maintains are factually inaccurate, incomplete, or misleading because they omit material circumstances surrounding the reported incidents.

230. These inaccuracies and omissions, considered together with the repeated attribution of third-party conduct to Pike's, contributed to an incomplete portrayal of the establishment and its operations.

231. The accumulation of such reports, regardless of whether they established wrongdoing by Pike's, contributed to the perception of

Pike's as a problematic establishment and provided a purported justification for the additional monitoring, investigations, and liquor-enforcement activity described herein.

232. Plaintiffs do not challenge the Police Department's legitimate responses to medical emergencies, crimes, patron disturbances, or requests for assistance. Rather, Plaintiffs challenge the alleged selective use of incidents associated with Pike's to justify heightened governmental scrutiny not comparably directed at similarly situated establishments.

### F. BLCE Conducts Repeated Undercover Investigations of Pike's.

233. The governmental scrutiny of Pike's was not limited to Township police.

234. Pike's also became the subject of BLCE investigations, undercover visits, inspections, requests for records, alleged violations, and enforcement activity.

235. Defendant Officer Blaker conducted multiple undercover investigations of Pike's beginning in approximately October 2024.

236. Officer Blaker conducted an undercover investigation at Pike's on October 25, 2024.

237. Additional undercover activity followed in November 2024.

238. On December 4, 2024, BLCE conducted a routine inspection of Pike's and issued a Request for Records.

239. BLCE subsequently alleged that a Pike's employee had failed to maintain required RAMP server/seller training.

240. Plaintiffs maintain that the employee was properly certified and that the resulting allegation was erroneous.

241. Plaintiffs nevertheless were required to respond to and incur expense in connection with the alleged violation.

242. Matt McCarthy subsequently discussed the alleged RAMP violation with Defendant Officer Brutosky, who appeared confused concerning the basis for the allegation.

243. Matt McCarthy later raised the same matter with Defendant Officer Fetterolf, who responded, in substance, "Yeah, that didn't happen." Plaintiffs maintain that BLCE nevertheless had asserted the violation and that Pike's was required to respond to it.

244. These circumstances reinforced Plaintiffs' concern that Pike's was being subjected to enforcement allegations that were not supported by the underlying facts.

245. The disputed RAMP allegation is relevant to the nature and intensity of BLCE's enforcement activity concerning Pike's, particularly when considered together with the repeated undercover investigations and inspections described herein.

246. During another inspection, Officer Blaker told Matt McCarthy that he had been working undercover at Pike's and that Pike's "looks young," or words to that effect.

247. Matt McCarthy asked Officer Blaker what Pike's could do to deter underage individuals from attempting to enter or purchase alcohol. Officer Blaker suggested that Pike's threaten to call police while checking identification.

248. Pike's continued its efforts to identify and prevent underage patrons from obtaining alcohol, including through the use of identification-scanning technology.

249. The October and November 2024 undercover activity and December 2024 inspection were not isolated events. BLCE continued conducting undercover investigations and enforcement activity concerning Pike's during 2025 and 2026, as alleged more fully below.

250. The frequency of BLCE's undercover investigations, the disputed RAMP allegation, and the apparent disparity in enforcement scrutiny between Pike's and Steam Pub are relevant to determining whether Pike's was subjected to selective regulatory enforcement.

251. Upon information and belief, the repeated undercover investigations and disputed RAMP allegation formed part of the broader pattern of governmental scrutiny directed at Pike's and its owners, including the coordinated Township police and BLCE activity described in the following sections.

**G. The February 2025 Joint Police/BLCE Operation.**

252. BLCE's scrutiny of Pike's intensified in February 2025.

253. On or about February 7, 2025, Defendant Officer Roskos and another BLCE officer conducted an undercover investigation at Pike's.

254. BLCE personnel observed patrons whom they considered youthful-appearing.

255. On or about February 21, 2025, BLCE conducted a significant enforcement operation at Pike's.

256. Upper Southampton Police Department personnel participated in and assisted with the operation. The operation therefore involved coordinated activity between Township police and BLCE.

257. According to information subsequently provided to Matt McCarthy, BLCE had been "tracking an underage individual" in connection with the February 21 operation.

258. Upon information and belief, the underage individual whom BLCE had been tracking in connection with the February 21, 2025 enforcement operation was Connor Costello.

259. Upon information and belief, Costello had previously frequented Steam Pub while under the legal drinking age.

260. Upon information and belief, Costello was admitted to Steam Pub, purchased or consumed alcoholic beverages there while underage, and/or was known to Steam Pub management or employees to be underage.

261. Upon information and belief, Steam Pub employs bouncers or other security personnel on busy nights and utilizes identification-scanning technology to screen patrons and verify their ages.

262. The use of identification scanners and security personnel at Steam Pub is relevant because Pike's likewise checked the identification of the three underage individuals identified during the February 21, 2025 operation, each of whom presented identification purporting to establish that the individual was of legal drinking age.

263. Upon information and belief, BLCE did not investigate Costello's prior attendance at Steam Pub, whether Steam Pub had previously admitted Costello while he was underage, and/or whether BLCE conducted comparable enforcement operations involving Steam Pub's identification-verification practices.

264. These circumstances provide an additional basis for examining whether BLCE and Township police applied comparable investigative and enforcement standards to similarly situated establishments, particularly where those establishments employed identification-screening procedures intended to prevent underage patronage.

265. During the February 21, 2025 operation, authorities identified three underage individuals. Pike's had carded each of those individuals.

266. Each of the three individuals had presented identification purporting to establish that he or she was of legal drinking age. Upon information and belief, the identification presented by each individual was false and/or did not accurately reflect that individual's age.

267. Thus, the presence of the three underage individuals did not result from Pike's simply failing to check identification. Pike's had required identification from each individual before permitting the individual to enter and/or purchase alcoholic beverages.

268. Defendant Officer Fetterolf played a substantial role in the February 21 enforcement activity.

269. Officer Fetterolf subsequently told Matt McCarthy that Pike's was "lucky" BLCE had not conducted an enforcement operation several weeks earlier because it would have been "way worse" for Pike's.

270. Officer Fetterolf further stated that BLCE had not conducted the earlier operation because it lacked sufficient manpower.

271. Those statements support an inference that BLCE had been planning or contemplating additional enforcement activity at Pike's even before the February 21 operation. They also indicate that BLCE's

investigative attention to Pike's was not confined to a single enforcement operation.

272. Officer Fetterolf also told Matt McCarthy that Pike's had a "drug problem." Matt McCarthy responded that he wanted to discuss that accusation because he had previously heard that such allegations were being made about Pike's.

273. Rather than identify the source or basis for the allegation, Officer Fetterolf again stated emphatically, "You have a drug problem," or words to that effect.

274. Plaintiffs deny that Pike's operated, maintained, knowingly permitted, or was the source of a "drug problem."

275. Officer Fetterolf's statement was consistent with the drug-related scrutiny previously directed at Matt McCarthy and Pike's by Township police.

276. Officer Fetterolf's repeated "drug problem" accusation is particularly significant because Township police previously had questioned third parties concerning whether Matt McCarthy himself was involved in drug dealing.

277. The February 21 operation also demonstrates that Township police and BLCE were not acting entirely independently with respect to Pike's. Township police personnel participated in and assisted BLCE with an enforcement operation specifically directed at the establishment. The joint operation establishes actual interagency cooperation, although the fact of cooperation alone does not establish an improper purpose.

278. Upon information and belief, allegations concerning supposed drug activity at Pike's and/or Matt McCarthy were communicated among Township police, BLCE personnel, and/or others and were used to justify or reinforce heightened governmental scrutiny of Pike's.

279. The February 21 operation, considered together with the preceding undercover investigations, subsequent enforcement activity, repeated accusations concerning alleged drug activity, and the Township Police Department's documented communications with BLCE, forms part of the broader pattern of governmental scrutiny challenged herein.

280. The nature and intensity of the joint enforcement operation are relevant to determining whether Pike's was intentionally subjected to materially different enforcement treatment than similarly situated licensed establishments, including Steam Pub.

## H. Officer Brutosky's Contacts with Township Police and the McCarthys.

281. Defendant Officer Brutosky is the BLCE officer with whom Pike's and the McCarthys have interacted most frequently during the period relevant to this action.

282. On at least one occasion, Officer Brutosky communicated by email with the Upper Southampton Township Police Department on the morning of a routine inspection of Pike's.

283. Upon information and belief, that communication concerned Pike's and/or the inspection to be conducted that day.

284. The timing of that communication—on the morning of a BLCE inspection of Pike's—provides further evidence of direct communication between BLCE and Township police concerning Pike's and BLCE activity involving the establishment.

285. During an inspection in Matt McCarthy's office, Officer Brutosky opened a case without Matt McCarthy's consent.

286. Before or while opening it, Officer Brutosky suggested that the case contained poker chips and cards. The case instead contained darts.

287. Matt McCarthy perceived Officer Brutosky's conduct as reflecting an expectation that the case contained evidence of unlawful gambling or another violation. Matt McCarthy had not represented that the case contained gambling equipment and had not consented to its inspection.

288. Officer Brutosky's examination of the case, including his apparent anticipation that it contained gambling equipment, is relevant to the nature and scope of the investigative scrutiny directed at Pike's during what was represented as a regulatory inspection.

289. During a more recent interaction, Matt McCarthy told Officer Brutosky that he was tired of what he perceived as bullying by the Upper Southampton Township Board of Supervisors, Upper Southampton Township Police Department, and liquor-enforcement authorities.

290. Matt McCarthy thereby expressly communicated to Officer Brutosky his concern that the governmental activity directed at Pike's

was excessive and involved both Township and liquor-enforcement authorities.

291. On March 16, 2026, Officer Brutosky participated with another BLCE officer in a routine inspection of Pike's.

292. Jim McCarthy was personally present during that inspection.

293. BLCE informed Jim McCarthy concerning its investigation and prior undercover activity at Pike's.

294. Jim McCarthy was therefore personally exposed to and required to respond to the continuing governmental scrutiny of Pike's.

295. BLCE thereafter pursued Citation No. 26-0254 in connection with its continuing investigation and enforcement activity concerning Pike's. *See* BLCE investigative materials/Citation No. 26-0254, attached hereto as Exhibit P.

296. The March 16, 2026 inspection and subsequent citation demonstrate that BLCE's investigative and enforcement activity concerning Pike's continued into 2026, notwithstanding the earlier undercover investigations, inspections, and enforcement proceedings.

297. Officer Brutosky's interactions with the McCarthys, together with his direct communication with Township police concerning Pike's and his participation in the March 16, 2026 inspection, further demonstrate that contacts between Township police and BLCE concerning Pike's continued beyond the February 2025 joint enforcement operation.

298. These events, considered together with the documented joint enforcement operation, Chief Varacallo's referral to BLCE, and the repeated inspections and investigations described herein, are relevant to determining the extent of interagency communications and whether Pike's was subjected to selective and unusually intensive regulatory scrutiny.

## I. Chief Varacallo Personally Refers Pike's to BLCE.

299. The connection between Township police and BLCE enforcement is independently documented in BLCE's own investigative and pre-hearing materials.

300. BLCE's pre-hearing materials concerning Citation No. 25-0363 state that, on or about February 3, 2025, a BLCE investigation was initiated "as a result of a complaint received from Chief Dominic

Varacallo" of the Upper Southampton Township Police Department. *See* Ex. A.

301. According to BLCE's pre-hearing materials, Chief Varacallo alleged that Pike's permitted underage persons to frequent the establishment and allowed patrons to remain at Pike's and consume alcohol until approximately 3:30 a.m. *See id.*

302. The 3:30 a.m. allegation was materially similar to Defendant Sergeant Hartranft's earlier accusation to Matt McCarthy that Pike's had "people in the bar every night until 3:30," or words to that effect.

303. The recurrence of the same specific 3:30 a.m. allegation—first in Sergeant Hartranft's accusation to Matt McCarthy and later in Chief Varacallo's complaint to BLCE—supports a reasonable inference that allegations concerning Pike's were being communicated or circulated within the Police Department and thereafter transmitted to state liquor-enforcement authorities.

304. BLCE acted upon Chief Varacallo's complaint by initiating an investigation of Pike's. BLCE thereafter conducted investigative activity and commenced enforcement proceedings concerning the allegations.

305. Chief Varacallo therefore was not merely a passive recipient of information concerning state liquor enforcement. He affirmatively supplied a complaint or referral concerning Pike's to BLCE that resulted in a BLCE investigation. His personal involvement in initiating the referral is expressly established by BLCE's own records.

306. The referral is significant because it establishes a direct causal connection between action taken by the Township's highest-ranking police official and subsequent state liquor-enforcement activity directed at Pike's. Unlike the other circumstances alleged herein from which Plaintiffs infer interagency communications, Chief Varacallo's referral and BLCE's initiation of an investigation in response are expressly documented.

307. Chief Varacallo's documented referral is also consistent with other alleged communications between Township police and liquor-enforcement authorities concerning Pike's, including Township officers' transmission or threatened transmission of information concerning Pike's to state liquor-enforcement authorities.

308. Upon information and belief, the referral directly led to the February 21, 2025 joint Township police/BLCE enforcement operation,

during which Township police personnel assisted BLCE in investigating Pike's.

309. Upon information and belief, the February 3, 2025 communication was one of multiple communications between Township police and BLCE concerning Pike's.

310. Chief Varacallo's personal initiation of the BLCE referral, considered together with the joint enforcement operation, directed patrols, closing-time checks, and subsequent BLCE investigations, demonstrates that the heightened scrutiny of Pike's involved affirmative participation by Township police leadership rather than merely isolated actions by individual officers.

311. Chief Varacallo's referral is relevant to determining whether Township police and BLCE selectively subjected Pike's to more intensive investigative and regulatory enforcement activity than similarly situated establishments, including Steam Pub.

**J. Continuing BLCE Enforcement.**

312. BLCE scrutiny of Pike's continued throughout the remainder of 2025 and into 2026.

313. BLCE conducted additional undercover investigations of Pike's during late 2025 and 2026.

314. In December 2025, a BLCE officer conducted another undercover investigation at Pike's.

315. On January 11, 2026, BLCE again conducted undercover activity at Pike's. That investigation resulted in an allegation concerning an after-hours sale.

316. Additional undercover activity occurred in February and March 2026.

317. On March 16, 2026, Defendant Officer Brutosky participated in a routine inspection of Pike's with another BLCE officer, during which Jim McCarthy was present. BLCE thereafter pursued Citation No. 26-0254. *See* Ex. P.

318. The December 2025 through March 2026 activity was part of a continuing course of BLCE scrutiny that had begun no later than October 2024 and included repeated undercover investigations, inspections, requests for records, and enforcement activity concerning Pike's.

319. The investigations and inspections were not confined to a single alleged violation or isolated enforcement incident. Rather, BLCE repeatedly returned to Pike's over approximately eighteen months, conducting undercover operations, reviewing the establishment's compliance with liquor regulations, and pursuing alleged violations arising from different investigative encounters.

320. Thus, by the time Hoeger resigned from the Board of Supervisors in May 2026, Pike's and its operators had already been subjected to a continuing series of Township police activity, BLCE undercover visits, inspections, investigations, and enforcement proceedings over a period of approximately eighteen months.

321. Much of that activity occurred while Hoeger remained a sitting Township Supervisor and after Township police had begun directing heightened attention toward Pike's, communicating allegations concerning Pike's to liquor-enforcement authorities, and participating with BLCE in enforcement activity involving the establishment.

322. Hoeger's May 2026 resignation did not erase the consequences of governmental activity initiated during her tenure.

Certain enforcement proceedings and consequences of governmental activity initiated during Hoeger's tenure continued after her May 2026 resignation.

323. Among those continuing consequences, Pike's has been operating under a temporary liquor license issued by the Pennsylvania Liquor Control Board as a result of the BLCE citations issued against the establishment.

324. A hearing on those citations was held in early summer 2026. A decision on the citations remains pending.

325. Upon information and belief, if the citations are resolved in Pike's favor, its liquor license will be reinstated without temporary status.

326. Pike's liquor license was renewed in or around September 2026. Notwithstanding that renewal, the license remained in temporary status, and Pike's continues to operate under a temporary license as of the filing of this Complaint.

327. The duration and frequency of these BLCE investigations, considered together with the Township Police Department's directed patrols, closing-time checks, participation in joint enforcement

operations, and Chief Varacallo's documented BLCE referral, demonstrate that the scrutiny directed at Pike's was sustained rather than episodic.

328. The cumulative nature of this activity is relevant to determining whether Pike's was subjected to materially different investigative and enforcement treatment than similarly situated licensed establishments, including Steam Pub.

329. Although much of the challenged activity occurred while Hoeger remained a Township Supervisor, Plaintiffs do not contend that the timing alone establishes her personal involvement in any particular BLCE investigation. Rather, Plaintiffs allege that her simultaneous public office and business relationship with Steam Pub form part of the broader factual circumstances relevant to their claims of selective enforcement and improper governmental favoritism.

**K. The Disparate Treatment of Pike's.**

330. Pike's is similarly situated in material respects relevant to the governmental treatment challenged in this action to Steam Pub and other restaurants, bars, and liquor licensees operating in Upper Southampton Township.

331. The General Davis is, upon information and belief, the only other bar within Upper Southampton Township that regularly remains open until approximately 2:00 a.m. and therefore represents a particularly relevant comparator with respect to police and regulatory scrutiny associated with late-night operations.

332. Pike's and Steam Pub operate in the same municipality, are both restaurant and bar establishments, and compete for substantially similar business, including customers, events, and food and beverage sales.

333. Both establishments are subject to the same municipal police jurisdiction. Both are subject to Township code and fire enforcement. Both operate pursuant to Pennsylvania liquor licenses and are subject to Pennsylvania liquor laws.

334. Upon information and belief, Steam Pub and other similarly situated establishments have experienced complaints, disturbances, police calls, alcohol-related incidents, and/or other events comparable to those occurring at Pike's.

335. Upon information and belief, Steam Pub has experienced underage patronage, after-hours gatherings, and other conduct

implicating the same regulatory concerns for which Pike's was repeatedly investigated.

336. On the evening of July 26, 2025, continuing into the early morning hours of July 27, 2025, Michael Liddy worked as a barback at Pike's.

337. Upon information and belief, Liddy maintained a close personal friendship with Robert Emig, a manager of Steam Pub.

338. At approximately 2:30 a.m. on July 27, 2025, while Pike's employees were completing their closing and cleanup responsibilities, Liddy asked Matt McCarthy for permission to leave work early.

339. When Matt McCarthy asked about Liddy's departure, Liddy stated that he wanted to attend "the after party at Steam," or words to that effect.

340. Matt McCarthy personally heard Liddy make that statement and permitted him to leave, advising that Matt McCarthy would complete the remaining cleanup responsibilities.

341. Liddy's statement concerning an anticipated gathering at Steam Pub after approximately 2:30 a.m. provides a specific factual basis for Plaintiffs' information and belief that after-hours gatherings

occurred at Steam Pub during the same period that Township police and BLCE were repeatedly scrutinizing Pike's for alleged after-hours activity.

342. Upon information and belief, alcoholic beverages were sold, furnished, and/or consumed at that particular gathering at Steam Pub, and Township police and/or BLCE personnel were aware of it.

343. In any event, Liddy's firsthand statement to Matt McCarthy identifies a specific individual, date, approximate time, and establishment relevant to Plaintiffs' allegations concerning the disparate investigation and enforcement of suspected after-hours activity at Pike's and Steam Pub.

344. On another occasion, approximately six individuals told Matt McCarthy that they had been turned away from Steam Pub after its security personnel questioned their out-of-state identification cards. Matt McCarthy personally examined the identification cards and found no indication that they were fraudulent or that the individuals were underage.

345. The individuals reported that a woman associated with Steam Pub, whom Matt McCarthy believed from their description to be

Defendant Hoeger, angrily directed them to leave and stated, in substance, that if they wanted to be served while underage, they should go to Pike's because Pike's would serve them.

346. Matt McCarthy has received repeated reports from multiple individuals concerning alleged drug use and after-hours drinking by Steam Pub management and employees.

347. Specifically, those individuals have reported to Matt McCarthy that Steam Pub management and employees have used cocaine in an office located downstairs at Steam Pub and that employees have remained at the establishment consuming alcoholic beverages after 4:00 a.m.

348. These reports are relevant to Plaintiffs' allegations that Township police and BLCE repeatedly investigated and characterized Pike's as having a "drug problem" and permitting after-hours drinking, while, upon information and belief, Steam Pub was not subjected to comparable scrutiny concerning similar allegations.

349. Notwithstanding that conduct, upon information and belief, Chief Varacallo did not make a comparable complaint or referral concerning Steam Pub to BLCE of the type he made concerning Pike's.

350. During a routine inspection of Pike's, BLCE Officer Blaker questioned Matt McCarthy about a proposed charitable golf tournament afterparty that Pike's had advertised. The tournament was canceled due to insufficient interest, the proposed afterparty never occurred, and Pike's did not sell or serve alcoholic beverages pursuant to the proposed promotion. Officer Blaker nevertheless repeatedly questioned Matt McCarthy about whether the event had taken place.

351. Officer Blaker's repeated questioning concerning an event that never occurred is relevant to Plaintiffs' allegations regarding the nature and persistence of BLCE's investigative scrutiny of Pike's.

352. Upon information and belief, Township police did not subject Steam Pub to a comparable pattern of directed patrols, officer-initiated closing checks, personal investigation of its ownership, regulatory referrals, or coordinated Township police/BLCE enforcement activity.

353. Upon information and belief, Steam Pub was not subjected to the repeated sequence of BLCE undercover investigations, inspections, and coordinated Township police/BLCE enforcement activity to which Pike's was subjected.

354. On or about October 9, 2022, a fatal shooting occurred at Steam Pub in which two individuals were killed.

355. Plaintiffs do not allege that Steam Pub was responsible for the criminal conduct of the third parties involved in that shooting. Rather, the incident is relevant to the disparate treatment alleged herein because it demonstrates that serious criminal activity occurred at or immediately adjacent to Pike's principal competitor within the same Township and police jurisdiction.

356. Notwithstanding that fatal incident, upon information and belief, Steam Pub was not thereafter subjected to the same pattern and intensity of directed police patrols, officer-initiated closing-time checks, monitoring, drug-related accusations and investigations, referrals to BLCE, undercover investigations, and coordinated Township police/BLCE enforcement activity that was directed at Pike's.

357. The disparity is particularly significant because Township police nevertheless characterized Pike's and/or its immediate vicinity as a "problem area," even though Plaintiffs are unaware of any shooting ever having occurred at Pike's.

358. Plaintiffs rely upon the October 9, 2022 shooting not to attribute third-party misconduct to Steam Pub, but to demonstrate the selective manner in which Defendants treated incidents occurring at or near licensed establishments when determining which establishments warranted heightened governmental scrutiny.

359. A publicly available Google review of Steam Pub reports that a female patron believed she had been drugged while at Steam Pub and further states that Steam Pub bartenders dismissed or failed to take seriously her report concerning the incident.

360. Plaintiffs do not allege that the allegations contained in that review are necessarily true and do not rely upon the review to establish that any drugging actually occurred at Steam Pub. Rather, the review is relevant to the information publicly available concerning alleged drug-related activity at a similarly situated establishment.

361. Upon information and belief, notwithstanding the existence of that publicly reported allegation, neither Steam Pub nor its ownership was subjected by Township police to an investigation comparable to the investigation into whether Matt McCarthy personally

was involved in drug dealing, nor was Steam Pub repeatedly characterized by Township police or BLCE as having a "drug problem."

362. The disparate treatment alleged herein is further illustrated by the different governmental responses to allegations of underage patronage, after-hours activity, and drug-related conduct at Pike's and Steam Pub.

363. With respect to Pike's, Township police and BLCE conducted repeated investigations, undercover operations, identification checks, closing-time scrutiny, regulatory referrals, and inquiries concerning alleged drug activity, including whether Matt McCarthy personally was involved in drug dealing.

364. By contrast, upon information and belief, Steam Pub was not subjected to a comparable pattern of investigations and enforcement activity, notwithstanding the information concerning its identification-screening practices, potential underage patronage, reported after-hours gatherings, and reported drug-related activity described above.

365. Plaintiffs do not contend that every complaint or allegation concerning either establishment necessarily warranted enforcement action. Rather, Plaintiffs allege that Defendants applied materially

different levels of investigative and regulatory scrutiny to comparable categories of alleged conduct involving Pike's and Steam Pub.

366. As alleged above, many of the police incidents associated with Pike's did not involve wrongdoing by Pike's at all, but instead involved medical emergencies, conduct by individual patrons, crimes committed against Pike's or the McCarthys, requests for police assistance, or complaints that responding officers did not substantiate.

367. Nevertheless, upon information and belief, Steam Pub and other similarly situated establishments were not subjected to the same pattern or intensity of:

a. directed police patrols;
b. officer-initiated closing-time checks;
c. monitoring of patrons outside the establishment;
d. investigation of their ownership or management for alleged drug dealing;
e. repeated governmental referrals to liquor-enforcement authorities;
f. coordination between Township police and BLCE;
g. repeated undercover BLCE investigations;
h. joint police/BLCE enforcement operations; or
i. other heightened governmental scrutiny.

368. The allegedly disparate treatment is particularly significant because Steam Pub was not an establishment unfamiliar to Township officials.

369. For years, the Board of Supervisors regularly held weekly Township meetings at Steam Pub. These meetings and gatherings provided Township officials with recurring opportunities for contact with Steam Pub's ownership and management.

370. Defendant Officer Bankert acknowledged to Matt McCarthy that the Police Department had maintained a "good relationship" with Martin Hoeger for approximately ten years.

371. During much of the same period, Defendant Hoeger served as a Township Supervisor while performing accounting work for and/or maintaining a business and financial relationship with Steam Pub, which was owned and operated by her husband, Defendant Martin Hoeger.

372. Despite that familiarity and relationship, upon information and belief, Steam Pub was not subjected to the same pattern and intensity of police and regulatory scrutiny directed at Pike's.

373. In particular, upon information and belief, Chief Varacallo did not make a comparable BLCE referral concerning Steam Pub, Township police did not investigate whether Martin Hoeger or Steam Pub's management personally engaged in drug dealing, and Steam Pub

was not subjected to the same combination of directed patrols, closing-time checks, regulatory referrals, and coordinated Township police/BLCE activity directed at Pike's.

374. The difference was not limited to the number of police contacts involving the establishments. Rather, Pike's was subjected to affirmative governmental activity—including directed patrols, officer-initiated closing checks, investigation of its owner for alleged drug dealing, referrals to BLCE, repeated undercover investigations, and coordinated Township police/BLCE enforcement activity—that, upon information and belief, was not similarly directed at Steam Pub.

375. That differential treatment is particularly significant given the close geographic proximity and direct commercial competition between the establishments, the Hoegers' financial interest in Steam Pub, the serious third-party incidents occurring at or near Steam Pub, and the publicly available allegations concerning conduct at Steam Pub that did not result in comparable Township-directed scrutiny.

376. The disparate-treatment inference is further supported by the contrast between the Police Department's affirmative designation of Pike's or its immediate vicinity as a "problem area" and the absence,

upon information and belief, of comparable treatment of Steam Pub following the October 9, 2022 double-fatal shooting in its parking area. Again, Plaintiffs rely on that incident not to attribute third-party misconduct to Steam Pub, but to demonstrate the allegedly selective application of criteria used to justify heightened scrutiny of Pike's.

377. Upon information and belief, the materially different treatment was intentional.

378. Upon information and belief, the differential treatment was influenced in whole or substantial part by communications, requests, or other efforts by the Hoegers to subject Pike's to heightened governmental scrutiny and thereby disadvantage Pike's and/or benefit Steam Pub.

379. The Hoegers had a concrete financial motive to do so because Pike's growth following Plaintiffs' March 2020 acquisition intensified the establishments' direct competition for customers, events, food and beverage sales, and other business.

380. Plaintiffs presently lack access to communications among the Hoegers, Township officials, Township police personnel, and BLCE personnel concerning Pike's, Steam Pub, and the enforcement activity

alleged herein, which information is principally or exclusively within Defendants' possession and control.

381. Alternatively and independently, there was no rational basis for subjecting Pike's and its operators to materially greater governmental scrutiny than similarly situated establishments and their operators based upon incidents in which Pike's committed no wrongdoing.

382. Upon information and belief, no legitimate governmental objective explains the materially different pattern and intensity of governmental scrutiny directed at Pike's as compared with Steam Pub and other similarly situated establishments.

383. The intentional and irrational differential treatment deprived Plaintiffs of the equal protection of the laws.

**L. The Hoegers' Participation and Joint Action.**

384. Until her resignation from the Board of Supervisors in May 2026, Hoeger simultaneously occupied a position of governmental authority as an elected Township Supervisor and maintained a business and financial relationship with a business directly competing with Pike's.

385. Martin Hoeger owned and operated that competing establishment, Steam Pub.

386. The principal Township police and BLCE activities giving rise to Plaintiffs' claims began and occurred while Hoeger remained a Township Supervisor.

387. The Hoegers also enjoyed a longstanding relationship with Township government through the Board of Supervisors' regular practice of holding weekly Township meetings at Steam Pub.

388. Defendant Officer Bankert separately acknowledged to Matt McCarthy a longstanding "good relationship" between the Police Department and Martin Hoeger, stating that the relationship had existed for approximately ten years, or words to that effect.

389. The Hoegers' financial interest in Steam Pub, their longstanding relationships with Township officials, and Hoeger's position as an elected Township Supervisor provided a potential motive and opportunities to influence governmental decisions affecting Pike's, a direct commercial competitor.

390. Upon information and belief, during her tenure on the Board, Hoeger communicated with Township officials, police personnel,

and/or other governmental actors concerning Pike's and/or the McCarthys.

391. Upon information and belief, Hoeger used the access, influence, authority, and opportunities afforded by her position as a Township Supervisor to request, encourage, facilitate, influence, or support governmental scrutiny of Pike's.

392. Upon information and belief, Martin Hoeger and/or Steam Pub communicated complaints, allegations, or information concerning Pike's and/or the McCarthys to Hoeger, Township officials, Township police, and/or other governmental actors.

393. Upon information and belief, the purpose and intended effect of some or all of those communications was to encourage or cause heightened governmental scrutiny of Pike's, thereby disadvantaging Pike's and benefiting its competitor, Steam Pub.

394. Upon information and belief, Township and/or BLCE actors received and acted upon information, complaints, requests, or other communications originating from or facilitated by the Hoegers and participated in the resulting governmental scrutiny of Pike's.

395. Upon information and belief, the Hoegers knowingly participated in efforts to influence governmental scrutiny of Pike's and certain governmental actors acted in furtherance of those efforts. Such participation, if established, constituted concerted action between private and governmental actors rather than merely independent complaints to law-enforcement authorities.

396. Hoeger's subsequent resignation from the Board in May 2026 does not alter the governmental character of conduct undertaken while she occupied public office or the consequences of governmental actions allegedly initiated, influenced, or facilitated during that period.

397. Plaintiffs' allegations of concerted action and improper government influence are supported by, among other things:

a. the direct competitive relationship between Pike's and Steam Pub;
b. Hoeger's simultaneous governmental role and business and financial relationship with Steam Pub;
c. the longstanding relationship between Steam Pub and Township government;
d. the Board of Supervisors' regular practice for years of holding weekly Township meetings at Steam Pub;
e. Officer Bankert's statement concerning the Police Department's approximately ten-year "good relationship" with Martin Hoeger;
f. the sustained pattern of directed and officer-initiated police activity at Pike's;

g. Officer Bankert's investigation into whether Matt McCarthy was involved in drug dealing;
h. Sergeant Hartranft's accusation concerning patrons remaining at Pike's until 3:30 a.m.;
i. the materially similar allegation subsequently communicated to liquor-enforcement authorities by Chief Varacallo;
j. repeated actual or threatened regulatory referrals concerning Pike's;
k. Chief Varacallo's documented referral of Pike's to BLCE, which resulted in a BLCE investigation;
l. direct communications between Township police and BLCE concerning Pike's;
m. the joint February 2025 Township police/BLCE operation;
n. repeated BLCE undercover investigations; and
o. Officer Fetterolf's statements concerning previously contemplated enforcement against Pike's and Pike's alleged "drug problem."

398. Considered collectively, these circumstances establish the existence of relationships among the relevant parties, a potential financial motive for favoring Steam Pub, and a sustained pattern of governmental scrutiny of Pike's. The nature and timing of the challenged conduct support an inference that the scrutiny may have been influenced by private interests associated with Steam Pub.

399. Plaintiffs acknowledge that the documented communications between Township police and BLCE do not, standing alone, establish that either Hoeger participated in those communications or directed the resulting enforcement activity. Rather, Plaintiffs allege that the

governmental relationships, competitive interests, alleged disparate treatment, and continuing enforcement activity must be considered collectively in evaluating their allegations of improper influence and joint action.

400. The perception that Pike's was being subjected to unusual governmental scrutiny was not limited to the McCarthys. During the relevant period, Matt McCarthy received statements from multiple persons—including individuals who worked at Steam Pub, persons employed as Upper Southampton Township police dispatchers, and law-enforcement officers employed outside Upper Southampton Township—indicating, in substance, that Pike's was being "targeted" by governmental authorities.

401. The precise content and extent of communications among the Hoegers, Township officials, Township police personnel, and BLCE personnel concerning Pike's are not presently known to Plaintiffs.

402. Additional evidence concerning those communications, any agreements or understandings among Defendants, and the extent of Defendants' coordination is principally within Defendants' possession and control and will be the subject of discovery.

403. To the extent the Hoegers knowingly participated with governmental officials in a common effort to subject Pike's to intentionally discriminatory enforcement, their conduct constituted joint action under color of state law and contributed to the deprivation of Plaintiffs' constitutional rights.

404. Any use by Hoeger of her governmental position to influence enforcement decisions for the purpose of benefiting Steam Pub and disadvantaging Pike's would constitute conduct undertaken through the exercise or misuse of governmental authority, rather than solely in her capacity as a private business associate.

**M. Municipal Policy, Custom, Practice, and Ratification.**

405. The governmental treatment of Pike's was not an isolated action by a single officer.

406. It occurred repeatedly over an extended period and involved multiple forms of police and regulatory activity.

407. It involved multiple Township police officers and supervisors, including Officer Kaminski, Officer Bankert, Sergeant Hartranft, and Chief Varacallo.

408. It included expressly identified directed patrols and officer-initiated closing-time checks of Pike's.

409. It included investigation into whether Matt McCarthy himself was involved in illegal drug activity.

410. It included recurring allegations that Pike's permitted patrons to remain at the establishment until approximately 3:30 a.m.

411. It included repeated actual or threatened referrals of Pike's to state liquor-enforcement authorities.

412. It involved Chief Varacallo, the Department's highest-ranking police official.

413. Chief Varacallo personally referred Pike's to BLCE for investigation, and BLCE initiated an investigation as a result of his complaint.

414. Township police also participated in a coordinated enforcement operation with BLCE at Pike's.

415. Township police personnel communicated directly with BLCE concerning Pike's.

416. The challenged activity therefore extended across multiple officers, supervisory levels, types of police activity, and interactions with state liquor-enforcement authorities.

417. The challenged activity also extended beyond monitoring Pike's itself and included affirmative police scrutiny of Matt McCarthy personally and his property, including an on-duty Township officer's late-night inspection of Matt McCarthy's personal vehicle and, as alleged herein, the subsequent warrantless placement and/or use of an electronic tracking device on that vehicle.

418. The repeated directed patrols, officer-initiated closing-time checks, and other affirmative police activity reflected an established operational practice within the Police Department rather than merely isolated, spontaneous decisions by individual officers.

419. Upon information and belief, Township policymakers and Police Department supervisors knew of the repeated and continuing pattern of enforcement activity directed at Pike's.

420. The involvement of multiple officers, the designation of directed patrols, the continuation of the challenged activity over an extended period, and Chief Varacallo's personal initiation of a BLCE

referral support an inference that supervisory personnel knew of and participated in at least portions of the challenged course of conduct.

421. Upon information and belief, responsible Township officials and Police Department supervisors permitted that activity to continue notwithstanding their knowledge of it and thereby authorized, approved, ratified, and/or knowingly acquiesced in the challenged course of conduct.

422. Upon information and belief, the challenged conduct reflected a municipal custom or practice of subjecting Pike's to heightened and differential police and regulatory scrutiny.

423. Alternatively, the repeated conduct was sufficiently persistent and widespread to constitute a municipal custom or practice having the force of municipal policy.

424. The repeated conduct of multiple officers, the use of directed patrols, and the participation of supervisory personnel support an inference that the challenged practices were sufficiently established within the Police Department to constitute a municipal custom, notwithstanding the absence of any presently identified written policy expressly authorizing selective enforcement against Pike's.

425. Alternatively, to the extent an official possessing final municipal policymaking authority with respect to the relevant subject matter directed or authorized the challenged conduct, or knowingly approved both the challenged conduct and its unconstitutional basis, the resulting constitutional violation constituted municipal action for purposes of 42 U.S.C. § 1983.

426. Under Pennsylvania's Second Class Township Code, the Upper Southampton Township Board of Supervisors possesses ultimate statutory authority for the organization and supervision of the Township Police Department. *See* 53 P.S. § 66902. Accordingly, Plaintiffs allege that the Board of Supervisors constituted the Township's final municipal policymaking authority with respect to the organization, supervision, and governing policies of the Police Department, including policies concerning the prevention and correction of unconstitutional selective enforcement.

427. Chief Varacallo, as Chief of Police, exercised operational command over Township police personnel and personally participated in the challenged course of conduct, including his documented February 3, 2025 referral of Pike's to BLCE.

428. Upon information and belief, Chief Varacallo established, directed, implemented, and/or approved departmental enforcement practices concerning Pike's, including the allocation of police resources, officer-initiated scrutiny, and communications with outside regulatory authorities.

429. To the extent the Board of Supervisors formally delegated final policymaking authority to Chief Varacallo concerning the particular enforcement practices or outside-agency referrals challenged herein, Plaintiffs alternatively allege that his decisions and directives constituted municipal policy within the scope of that delegation. The existence and scope of any such delegation will be determined from applicable Township ordinances, resolutions, departmental directives, and other governing materials.

430. Upon information and belief, the Township, acting through officials possessing final policymaking authority, knowingly approved, adopted, or ratified the challenged practices and the allegedly improper bases for those practices, thereby permitting the unconstitutional differential treatment of Pike's to continue. Plaintiffs do not rely merely upon the absence of disciplinary action or the failure to investigate

complaints as establishing ratification, but allege that municipal policymakers knowingly accepted or approved the challenged conduct and its unconstitutional basis.

431. During the same period, a sitting Township Supervisor maintained a business and financial relationship with Steam Pub, a direct competitor of Pike's.

432. Township officials also had a longstanding practice of regularly holding weekly Township meetings at Steam Pub.

433. A Township police officer acknowledged that the Department had maintained a "good relationship" with Steam Pub's owner for approximately ten years.

434. Upon information and belief, Township policymakers and supervisory officials knew or should have known of the relationship between a sitting Township Supervisor and Steam Pub, the longstanding relationship between Steam Pub and Township government, and the potential for that relationship to influence governmental activity affecting a competing establishment.

435. These circumstances presented a potential conflict of interest requiring Township officials to ensure that municipal police

authority was exercised for legitimate law-enforcement purposes rather than to advance the private competitive interests of a Township official or favored establishment.

436. Upon information and belief, the Township failed to implement or enforce adequate policies, supervision, training, conflict-of-interest safeguards, or other measures reasonably necessary to prevent municipal police authority from being influenced or used for private competitive purposes.

437. Upon information and belief, the Township also failed to adequately supervise, review, or correct the repeated police activity directed at Pike's despite the duration of that activity, the involvement of multiple officers and supervisors, and Chief Varacallo's personal participation in referring Pike's to BLCE.

438. The Township's failure to supervise or correct the challenged practices, despite supervisory awareness of their recurring nature, permitted those practices to continue and contributed to the alleged differential treatment of Pike's.

439. To the extent Township policymakers were aware that the challenged practices involved intentional and unjustified differential

treatment, their continued authorization or knowing approval of those practices constituted deliberate indifference to the resulting deprivation of Plaintiffs' constitutional rights.

440. Upon information and belief, the Township's failure to implement or enforce appropriate supervisory and conflict-of-interest safeguards contributed to the continuation of the challenged practices.

441. The repeated nature of the challenged conduct, the participation of supervisory personnel, and the absence of corrective action support an inference that the conduct was accepted, approved, tolerated, and/or knowingly acquiesced in by responsible municipal officials rather than constituting isolated misconduct by individual officers.

442. Plaintiffs presently lack access to the Township's internal directives, supervisory communications, policymaker communications, training materials, disciplinary records, and other information concerning authorization, supervision, review, or ratification of the challenged conduct. Such information is principally within the Township's possession and control and will be the subject of discovery.

443. The municipal customs and practices described herein were a direct and proximate cause of the intentional differential treatment of Pike's and its operators and constituted moving forces behind the alleged violations of Plaintiffs' constitutional rights.

444. Alternatively, to the extent the evidence establishes that an authorized final municipal policymaker directed, adopted, or ratified the challenged enforcement decisions and their unconstitutional basis, those policymaker decisions independently constituted municipal action and were moving forces behind the resulting constitutional injuries.

**N. Harm to Plaintiffs.**

445. Defendants' conduct caused and continues to cause substantial harm to Plaintiffs.

446. Repeated visible police presence, directed patrols, inspections, and enforcement activity at Pike's deterred customers and prospective customers from patronizing the establishment.

447. Customers and prospective customers observed and became aware of the repeated police and regulatory activity directed at Pike's, causing actual and prospective customers to associate the establishment with heightened police and regulatory scrutiny and

creating the impression that Pike's was a problematic or unsafe establishment.

448. Repeated investigations, referrals, undercover activity, inspections, and enforcement proceedings damaged Pike's reputation and goodwill.

449. Pike's incurred attorneys' fees, costs, and business expenses in responding to governmental investigations, inspections, citations, and enforcement proceedings that Plaintiffs allege were initiated, prolonged, or intensified as part of the challenged course of discriminatory enforcement.

450. The BLCE citations arising from the challenged course of enforcement also placed Pike's liquor license—the license on which its business as a restaurant and bar depends—in temporary status. Pike's has continued to operate under that temporary status through its most recent license renewal, and the restoration of its license to non-temporary status remains contingent on the outcome of the pending citation proceedings.

451. Pike's lost customers, revenue, profits, events, and prospective business opportunities as a result of the challenged governmental conduct.

452. These losses included diminished customer patronage, interference with existing and prospective business relationships, and the diversion of business resources from ordinary operations to responding to repeated governmental investigations and enforcement activity.

453. The governmental scrutiny impaired Pike's ability to compete on equal terms with Steam Pub and other similarly situated establishments.

454. The economic consequences were compounded by the alleged differential treatment because, upon information and belief, Steam Pub and other similarly situated establishments were not subjected to comparable levels of visible police presence, regulatory referrals, undercover investigations, and coordinated enforcement activity.

455. The resulting economic harm was caused not merely by the existence of police or regulatory enforcement, but by the allegedly

intentional, selective, and unjustifiably disproportionate governmental scrutiny directed at Pike's.

456. Matt McCarthy was personally subjected to accusations and investigations concerning supposed drug dealing and after-hours operations and was required to devote substantial time and resources to responding to governmental scrutiny.

457. The investigation into whether Matt McCarthy personally was involved in drug dealing, together with repeated accusations that Pike's had a "drug problem," caused Matt McCarthy personal embarrassment, humiliation, anxiety, and reputational harm.

458. Jim McCarthy was personally subjected to and required to respond to BLCE inspection and enforcement activity concerning Pike's, including the March 16, 2026 inspection.

459. Matt and Jim McCarthy each devoted substantial personal time and resources to responding to investigations, inspections, allegations, enforcement activity, and other governmental scrutiny directed at Pike's.

460. To the extent Defendants' conduct directly infringed the McCarthys' individual constitutional rights, as distinguished from

rights belonging to 2 Guyz LLC, Matt and Jim McCarthy seek recovery for their own resulting injuries, including any proven personal economic losses, reputational injuries, emotional distress, and other compensable damages.

461. Separately, 2 Guyz LLC, doing business as Pike's Pub, suffered injury to its business operations, customer relationships, goodwill, revenue, and profitability, and incurred expenses attributable to the challenged governmental conduct.

462. Plaintiffs have incurred, and will continue to incur, legal expenses in seeking redress for the alleged violations of their constitutional rights, and seek recovery of reasonable attorneys' fees and costs to the extent authorized by 42 U.S.C. § 1988 and other applicable law.

463. Plaintiffs have suffered, and continue to suffer, economic losses and other damages as a direct and proximate result of the conduct alleged herein, in amounts to be established through discovery and at trial.

464. Plaintiffs seek compensatory damages for all injuries legally attributable to Defendants' unconstitutional conduct, together with such other relief as may be available under applicable law.

**COUNT I**
**<u>42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection Selective Enforcement</u>**
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1–10)**

465. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

466. The Equal Protection Clause of the Fourteenth Amendment prohibits governmental actors from selectively enforcing otherwise valid laws, regulations, and governmental authority against a person or entity while declining to subject similarly situated persons or entities to comparable enforcement where the differential treatment is intentionally based upon an unjustifiable standard, some other arbitrary factor, or another constitutionally impermissible consideration.

467. Plaintiffs allege that Defendants intentionally subjected Pike's and the McCarthys to heightened police and regulatory

enforcement for the improper purpose of disadvantaging Pike's and benefiting a favored competing establishment.

468. Pike's was similarly situated in all material respects relevant to the governmental treatment challenged herein to Steam Pub and other restaurants, bars, and liquor licensees operating within Upper Southampton Township.

469. Pike's and Steam Pub operated within the same municipality, competed for substantially similar customers and business, operated as restaurants and bars pursuant to Pennsylvania liquor licenses, were subject to the same municipal police jurisdiction, and were subject to materially similar municipal and state regulatory requirements relevant to the challenged governmental conduct.

470. The similarity between Pike's and Steam Pub is particularly substantial because the establishments are located approximately 0.3 miles apart, compete directly for the same general customer base and business, operate within the same municipal police jurisdiction, and are subject to the same general liquor-enforcement regime.

471. The McCarthys acquired Pike's in March 2020 and thereafter substantially grew its business, increasing Pike's direct

competition with Steam Pub for customers, events, food and beverage sales, and other business.

472. Upon information and belief, Steam Pub and other similarly situated establishments experienced complaints, disturbances, police calls, alcohol-related incidents, patron misconduct, and/or other events comparable in relevant respects to incidents occurring at Pike's.

473. Many of the police incidents associated with Pike's did not involve wrongdoing by Pike's or the McCarthys, but instead involved medical emergencies, individual patron conduct, crimes committed against Pike's or the McCarthys, requests for police assistance, and complaints that responding officers did not substantiate.

474. Notwithstanding those similarities, Plaintiffs were subjected to materially different and more burdensome governmental treatment than Steam Pub and other similarly situated establishments and their owners and operators.

475. The differential treatment included, among other things:

a. directed police patrols specifically involving Pike's;
b. officer-initiated closing-time checks;
c. monitoring of Pike's and its patrons;
d. investigation into whether Matt McCarthy himself was involved in illegal drug activity;

e. repeated allegations concerning supposed after-hours activity at Pike's;
f. actual or threatened referrals to state liquor-enforcement authorities;
g. direct communications between Township police and BLCE concerning Pike's;
h. Chief Varacallo's affirmative referral of Pike's to BLCE, which resulted in a BLCE investigation;
i. repeated undercover BLCE investigations;
j. coordinated Township police/BLCE enforcement activity;
k. repeated inspections and enforcement proceedings; and
l. the other heightened governmental scrutiny alleged herein.

476. Upon information and belief, Steam Pub and other similarly situated establishments and their owners and operators were not subjected to a comparable pattern, frequency, duration, or intensity of such governmental scrutiny despite experiencing comparable types of police calls, complaints, disturbances, alcohol-related incidents, and regulatory issues.

477. The differential treatment is particularly significant because serious third-party incidents also occurred at or near Steam Pub, including the October 2022 shooting in Steam Pub's parking lot in which two individuals were killed, yet, upon information and belief, Steam Pub was not subjected to the same sustained pattern of directed Township police patrols, officer-initiated closing checks, regulatory

referrals, investigation of its ownership, or coordinated Township police/BLCE activity directed at Pike's.

478. Likewise, although Township police investigated whether Matt McCarthy personally was involved in illegal drug activity and BLCE personnel repeatedly characterized Pike's as having a "drug problem," Plaintiffs are unaware of any drug-related arrest, charge, citation, or recovery of illegal drugs involving Pike's or Matt McCarthy.

479. Upon information and belief, Chief Varacallo did not make a comparable complaint or referral concerning Steam Pub to BLCE, and Steam Pub was not subjected to the same pattern of BLCE investigation and coordinated Township police/BLCE enforcement activity directed at Pike's.

480. The challenged differential treatment resulted from affirmative enforcement decisions, including directed patrols, officer-initiated investigations, and regulatory referrals, rather than merely the incidental presence of police officers responding to unrelated emergencies or requests for assistance.

481. The differential treatment further included Chief Varacallo's unusual affirmative referral of Pike's to BLCE for investigation, which,

upon information and belief, departed from the Township Police Department's ordinary practices concerning similarly situated licensed establishments.

482. Upon information and belief, affirmative referrals of particular licensed establishments to BLCE by the Township Police Department—and particularly by the Chief of Police personally—were not a routine component of the Department's response to ordinary police calls, complaints, patron misconduct, or other incidents occurring at licensed establishments within the Township.

483. The differential treatment was not accidental, inadvertent, or the product of a single isolated enforcement decision, but instead occurred repeatedly over an extended period and involved multiple governmental actors, supervisory personnel, forms of police activity, communications with BLCE, and liquor-enforcement activity.

484. Upon information and belief, the selective treatment was based, in whole or substantial part, upon arbitrary and improper considerations, including an effort to use governmental police and regulatory authority to disadvantage Pike's and protect or benefit Steam Pub, a competing establishment whose owners possessed

longstanding relationships with Township government and Township police. The challenged enforcement decisions were motivated by those improper considerations rather than by neutral and consistently applied law-enforcement standards.

485. That arbitrary and improper motive was economic as well as personal. As Pike's business grew following the McCarthys' March 2020 acquisition, Pike's increasingly competed with Steam Pub for customers, events, food and beverage sales, and other business.

486. Upon information and belief, Defendants' selective enforcement of police and regulatory authority against Pike's was intended, at least in substantial part, to disadvantage Pike's in that competition and protect or advance Steam Pub's commercial interests.

487. Upon information and belief, Defendants intentionally selected Pike's for materially greater investigative and regulatory scrutiny than similarly situated establishments based upon arbitrary and unjustifiable considerations, including the private economic interests of favored persons and businesses, rather than upon neutral and consistently applied law-enforcement criteria.

488. The materially different treatment of Pike's and Steam Pub is further supported by the allegations that Steam Pub utilized identification scanners and security personnel, that an individual believed to have been tracked by BLCE during the February 21, 2025 operation may previously have frequented Steam Pub while underage, that a person with a close relationship to Steam Pub management described an after-hours gathering at Steam Pub on July 27, 2025, and that Matt McCarthy received repeated reports concerning alleged drug use and after-hours drinking by Steam Pub personnel.

489. Upon information and belief, notwithstanding these circumstances, Township police and BLCE did not subject Steam Pub to investigative or enforcement activity comparable in frequency, duration, or intensity to the activity directed at Pike's concerning underage patrons, after-hours operations, and alleged drug activity.

490. The disparity further supports Plaintiffs' allegation that the challenged governmental scrutiny was not imposed pursuant to neutral and consistently applied enforcement standards, but instead reflected intentional differential treatment of Pike's and the McCarthys.

491. Considered together with the relationships among the Hoegers and Township officials, the recurring enforcement activity, and the affirmative involvement of supervisory personnel, the disparity supports Plaintiffs' allegation that the challenged conduct constituted intentional and discriminatory selective enforcement.

492. During much of the relevant period, Defendant Hoeger simultaneously served as an elected Township Supervisor and performed accounting work for and/or maintained a business and financial relationship with Steam Pub, which was owned and operated by her husband, Defendant Martin Hoeger.

493. The Hoegers therefore possessed a concrete private economic interest in Steam Pub's commercial success and a corresponding economic motive to disadvantage Pike's, divert business from Pike's, and reduce Pike's ability to compete with Steam Pub.

494. At the same time, the Hoegers possessed unusual access to Township government and Township police: Hoeger served on the Township's governing body; Township officials regularly held weekly meetings at Steam Pub; and Officer Bankert acknowledged the Police Department's longstanding "good relationship" with Martin Hoeger.

495. Upon information and belief, Hoeger knowingly and intentionally participated in, encouraged, facilitated, influenced, and/or caused the differential governmental treatment of Pike's by using the access, influence, and opportunities afforded by her public office.

496. Upon information and belief, Hoeger sought, encouraged, and/or facilitated governmental review, investigation, monitoring, or other scrutiny of Pike's. Hoeger did not merely possess access and an economic motive to disadvantage Pike's, but affirmatively used the access and opportunities afforded by her governmental position to cause, encourage, or facilitate governmental scrutiny of Pike's.

497. The use or manipulation of governmental police and regulatory authority to advance the private competitive and financial interests of favored private actors and to disadvantage a competing business constitutes an arbitrary and unjustifiable basis for selectively subjecting Pike's and the McCarthys to materially different governmental treatment. Such considerations motivated the challenged enforcement activity and resulted in Pike's being singled out for scrutiny not comparably imposed upon similarly situated establishments.

498. Upon information and belief, the governmental Defendants knew of and intentionally participated in the differential treatment and acted, at least in substantial part, because of the arbitrary and improper considerations alleged herein rather than merely in spite of the resulting disadvantage to Pike's. The alleged discriminatory purpose was a motivating factor in the challenged enforcement decisions.

499. To the extent Hoeger used the access, influence, and opportunities afforded by her public office to cause, facilitate, influence, or participate in governmental action against Plaintiffs, she acted under color of state law.

500. Chief Varacallo knowingly and personally participated in the challenged course of conduct by, among other things, communicating allegations concerning Pike's to state liquor-enforcement authorities and affirmatively referring Pike's to BLCE for investigation, which resulted in BLCE initiating an investigation of Pike's.

501. Upon information and belief, Chief Varacallo further personally participated in the challenged course of conduct by directing, authorizing, approving, and/or knowingly acquiescing in directed

patrols, officer-initiated closing checks, monitoring, and other heightened police activity specifically involving Pike's.

502. Officer Kaminski knowingly and personally participated in the challenged course of conduct by conducting directed police activity involving Pike's and threatening and/or facilitating regulatory referral concerning Pike's.

503. Officer Bankert knowingly and personally participated in the challenged course of conduct by investigating alleged drug activity associated with Pike's, questioning individuals concerning whether Matt McCarthy himself was involved in drug dealing, and otherwise participating in heightened scrutiny of Pike's.

504. Sergeant Hartranft knowingly and personally participated in the challenged course of conduct by confronting Matt McCarthy and accusing Pike's of routinely permitting patrons to remain in the establishment until approximately 3:30 a.m., an allegation materially similar to the allegation subsequently communicated by Chief Varacallo to state liquor-enforcement authorities.

505. Officer Brutosky knowingly and personally participated in the challenged course of conduct by conducting inspections and

enforcement activity involving Pike's, communicating with Township police concerning Pike's, and participating in the March 16, 2026 inspection at which Jim McCarthy was present.

506. Officer Fetterolf knowingly and personally participated in the challenged course of conduct through his participation in the February 2025 enforcement activity and other scrutiny of Pike's and by making statements concerning previously contemplated enforcement activity at Pike's and repeatedly asserting that Pike's had a "drug problem."

507. Officer Blaker knowingly and personally participated in the challenged course of conduct through repeated undercover investigations of Pike's and the disputed RAMP investigation and enforcement activity.

508. Officer Roskos knowingly and personally participated in the challenged course of conduct through undercover investigative activity involving Pike's and his participation in the February 2025 enforcement sequence.

509. Defendants Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and the governmental John Doe

Defendants acted under color of state law when engaging in the governmental conduct alleged herein.

510. Upon information and belief, Defendants Martin Hoeger and Steam Pub knowingly communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Hoeger and/or governmental actors for the purpose of causing or encouraging governmental action adverse to Pike's and thereby disadvantaging Pike's and benefiting Steam Pub.

511. Upon information and belief, Martin Hoeger and Steam Pub did more than merely provide information to governmental authorities. They willfully participated with one or more governmental Defendants in the differential governmental treatment alleged herein.

512. Upon information and belief, Martin Hoeger and/or Steam Pub and one or more governmental Defendants reached an agreement, understanding, or jointly accepted plan, whether express or tacit, to cause, encourage, facilitate, and/or participate in heightened governmental scrutiny of Pike's.

513. Upon information and belief, Martin Hoeger and Steam Pub knew the essential nature and general scope of that understanding and intentionally participated in furthering its purpose.

514. Acts in furtherance of that alleged joint activity included, upon information and belief, communications of complaints, allegations, and information concerning Pike's and the McCarthys to governmental actors and the governmental investigations, directed police activity, regulatory referrals, and other heightened scrutiny alleged herein that followed and/or resulted from those communications.

515. By willfully participating in joint activity with governmental actors and acting pursuant to the alleged agreement or understanding, Martin Hoeger and Steam Pub acted under color of state law for purposes of 42 U.S.C. § 1983. Their participation extended beyond merely reporting suspected misconduct or maintaining favorable relationships with governmental officials and involved knowing participation in the allegedly discriminatory enforcement scheme.

516. The precise content and extent of communications and agreements among the Hoegers, Steam Pub, Township officials, Township police personnel, and BLCE personnel are not presently

known to Plaintiffs and are principally within Defendants' possession and control.

517. Each Defendant against whom this Count is asserted personally participated in, caused, facilitated, and/or willfully participated in the constitutional deprivation alleged herein in the manner alleged above and in the incorporated factual allegations of this Complaint.

518. Defendants' intentional selective enforcement and differential treatment of Plaintiffs on the arbitrary and improper bases alleged herein, including the alleged use of governmental authority to advance private competitive interests and disadvantage Pike's, deprived Plaintiffs of their rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

519. Defendants' conduct was a direct and proximate cause of the injuries and damages alleged herein.

520. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered economic losses, loss of business and business opportunities, damage to reputation and goodwill, costs and expenses

incurred in responding to the challenged governmental activity, and the other injuries and damages alleged herein.

521. The conduct of the individual Defendants was intentional, willful, malicious, reckless, and/or undertaken with reckless or callous indifference to Plaintiffs' federally protected rights, thereby supporting an award of punitive damages against those individual Defendants for whom the evidence establishes the requisite state of mind.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1-10 on Count I; compensatory and nominal damages; punitive damages against the individual Defendants and private Defendants where permitted by law; appropriate declaratory and prospective injunctive relief, including a declaration that the selective and differential governmental treatment established herein violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and an injunction prohibiting Defendants from continuing or engaging in such unconstitutional selective treatment of Plaintiffs; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

prejudgment and post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

**COUNT II**
**<u>42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection Class-of-One (Pleaded in the Alternative to Count I)</u>**
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1–10)**

522. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

523. Plaintiffs plead this class-of-one Equal Protection claim in the alternative to their selective-enforcement claim asserted in Count I.

524. The Equal Protection Clause of the Fourteenth Amendment prohibits governmental actors from intentionally treating a person or entity differently from others similarly situated where there is no rational basis for the difference in treatment.

525. A class-of-one claim does not require Plaintiffs to establish membership in a protected class, but instead requires intentional differential treatment of similarly situated persons or entities without a rational basis.

526. Pike's was similarly situated in all material respects relevant to the governmental treatment challenged herein to Steam

Pub and other restaurants, bars, and liquor licensees operating within Upper Southampton Township.

527. Pike's and Steam Pub are located approximately 0.3 miles apart, operate within the same municipality and municipal police jurisdiction, operate as restaurants and bars pursuant to Pennsylvania liquor licenses, compete for substantially similar customers and business, and are subject to materially similar municipal and state regulatory requirements relevant to the challenged governmental conduct.

528. Upon information and belief, Steam Pub and other similarly situated establishments experienced complaints, disturbances, police calls, alcohol-related incidents, patron misconduct, regulatory issues, and/or other events comparable in relevant respects to incidents occurring at Pike's.

529. Nevertheless, Defendants intentionally subjected Pike's and the McCarthys to a materially different pattern, frequency, duration, and intensity of governmental scrutiny than Steam Pub and other similarly situated establishments and their owners and operators.

530. The differential treatment included, among other things, directed police patrols specifically involving Pike's; officer-initiated closing-time checks; monitoring of Pike's, its patrons, and the McCarthys; investigation into whether Matt McCarthy personally was involved in illegal drug activity; repeated allegations concerning supposed after-hours activity; actual or threatened regulatory referrals; Chief Varacallo's affirmative referral of Pike's to BLCE; repeated undercover BLCE investigations; coordinated Township police/BLCE activity; repeated inspections and enforcement proceedings; police scrutiny directed personally at Matt McCarthy, including inquiries concerning his alleged involvement in drug activity; and the other heightened governmental scrutiny alleged herein.

531. Upon information and belief, Steam Pub and other similarly situated establishments and their owners and operators were not subjected to a comparable pattern, frequency, duration, or intensity of governmental scrutiny under materially comparable circumstances.

532. Defendants intentionally subjected Plaintiffs to the materially different governmental treatment alleged herein. The disparity reflected affirmative decisions to subject Pike's to heightened

scrutiny, rather than merely incidental differences in the number of police calls or regulatory contacts involving the establishments.

533. The differential treatment was not accidental, inadvertent, or merely the result of isolated discretionary decisions, but instead occurred repeatedly over an extended period and involved multiple governmental actors, supervisory personnel, forms of police activity, communications with BLCE, and liquor-enforcement activity.

534. There was no rational basis for subjecting Pike's and the McCarthys to the cumulative and sustained pattern of heightened governmental scrutiny alleged herein while declining to subject similarly situated establishments and their owners and operators to comparable treatment.

535. Plaintiffs challenge the allegedly irrational disparity in the nature, frequency, and intensity of enforcement activity, rather than asserting that every individual police investigation, inspection, or regulatory referral was independently unlawful.

536. In particular, many incidents associated with Pike's involved medical emergencies, individual patron misconduct, crimes committed against Pike's or the McCarthys, requests by Plaintiffs for police

assistance, unsubstantiated complaints, and other third-party conduct rather than misconduct by Pike's or the McCarthys.

537. There was no rational basis for treating such incidents as grounds for heightened governmental scrutiny of Pike's while not treating materially comparable incidents involving similarly situated establishments in the same manner. The disparate enforcement response cannot be explained by legitimate differences in the nature or seriousness of the underlying incidents.

538. Likewise, although Township police investigated whether Matt McCarthy personally was involved in illegal drug activity and BLCE personnel repeatedly characterized Pike's as having a "drug problem," Plaintiffs are unaware of any drug-related arrest, criminal charge, citation, or recovery of illegal drugs involving Pike's or Matt McCarthy.

539. The continued focus on Matt McCarthy personally and the repeated characterization of Pike's as having a "drug problem," when considered with the absence of any identified drug-related charge or recovery and the allegedly different treatment of comparable

establishments, further support the inference that the challenged pattern of scrutiny lacked a rational basis.

540. The irrationality of the differential treatment is further demonstrated by Defendants' treatment of incidents occurring at or near Pike's as grounds for heightened governmental attention while not subjecting Steam Pub to comparable treatment despite serious third-party incidents occurring at or immediately adjacent to Steam Pub, including the October 2022 shooting in Steam Pub's parking lot in which two individuals were killed.

541. Plaintiffs do not allege that Steam Pub should have been subjected to heightened governmental scrutiny merely because such third-party incidents occurred at or near its premises. Rather, the disparate treatment is relevant to whether Defendants applied materially different enforcement standards to incidents involving third-party conduct at or near the respective establishments without a legitimate basis for doing so.

542. Upon information and belief, Chief Varacallo did not make a comparable affirmative BLCE referral concerning Steam Pub or other

similarly situated establishments despite police calls, complaints, disturbances, and other incidents associated with those establishments.

543. Upon information and belief, Chief Varacallo's affirmative referral of Pike's to BLCE, which resulted in BLCE initiating an investigation, is part of the broader pattern of allegedly irrational differential treatment, rather than independently establishing a constitutional violation merely because the Chief communicated suspected liquor-law violations to BLCE.

544. The absence of a rational basis for the differential treatment is further supported by the direct commercial competition between Pike's and Steam Pub, the Hoegers' financial interest in Steam Pub, Hoeger's simultaneous service as an elected Township Supervisor, Steam Pub's longstanding relationship with Township government and Township police, and the materially different governmental treatment afforded to Steam Pub. These circumstances provide additional context for the allegedly arbitrary distinction drawn between the establishments.

545. The absence of a rational basis for the differential treatment is further demonstrated by the manner in which Defendants

investigated alleged underage patronage, after-hours activity, and drug-related conduct at Pike's while, upon information and belief, declining to undertake comparable investigative or enforcement activity concerning materially similar allegations involving Steam Pub.

546. In particular, the existence of identification-screening procedures at both establishments, the information concerning potential underage patronage at Steam Pub, the specifically identified July 27, 2025 after-hours gathering, and the repeated reports concerning alleged drug-related activity at Steam Pub are relevant to the comparison between the establishments, to the extent those matters involved materially comparable circumstances known to the responsible governmental actors.

547. Those circumstances support the reasonable inference that the distinction drawn between Pike's and similarly situated establishments was not based upon a legitimate governmental distinction between the establishments, but instead was arbitrary, irrational, and influenced by considerations unrelated to legitimate law-enforcement or regulatory objectives.

548. Upon information and belief, Hoeger knowingly and intentionally participated in, encouraged, facilitated, influenced, and/or caused the differential governmental treatment of Plaintiffs through the access, influence, and opportunities afforded by her public office. Her governmental position, business relationship with Steam Pub, and access to Township officials provided a potential means and motive to influence the challenged treatment.

549. To the extent Hoeger used her governmental position, access, influence, or authority to cause, facilitate, influence, or participate in the challenged governmental treatment, she acted under color of state law. Any such participation involved the use of governmental authority or influence associated with her public office, rather than conduct undertaken solely in her private capacity.

550. Chief Varacallo knowingly and personally participated in the challenged differential treatment by, among other things, communicating allegations concerning Pike's to state liquor-enforcement authorities and affirmatively referring Pike's to BLCE for investigation.

551. Upon information and belief, Chief Varacallo further personally participated by directing, authorizing, approving, and/or knowingly acquiescing in directed patrols, officer-initiated closing checks, monitoring, and other heightened police activity specifically involving Pike's.

552. Defendants Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and the governmental John Doe Defendants personally participated in the differential governmental treatment in the respective manners alleged above and acted under color of state law. Each such Defendant is liable only to the extent that Defendant personally participated in the allegedly intentional and irrational differential treatment, rather than merely performing otherwise lawful police or regulatory duties.

553. Upon information and belief, Martin Hoeger and Steam Pub knowingly communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Hoeger and/or governmental actors for the purpose of causing, encouraging, or facilitating governmental action adverse to Pike's.

554. Upon information and belief, Martin Hoeger and Steam Pub willfully participated in joint activity with persons acting under color of state law to cause, encourage, facilitate, and/or accomplish the differential governmental treatment alleged herein and therefore acted under color of state law for purposes of 42 U.S.C. § 1983. Such participation extended beyond merely reporting suspected misconduct or maintaining favorable relationships with governmental officials and involved knowing participation in the allegedly irrational differential treatment.

555. The precise content and extent of communications and agreements among the Hoegers, Steam Pub, Township officials, Township police personnel, and BLCE personnel are not presently known to Plaintiffs and are principally within Defendants' possession and control.

556. Each Defendant against whom this Count is asserted personally participated in, caused, facilitated, and/or willfully participated in the constitutional deprivation alleged herein in the manner alleged above and in the incorporated factual allegations of this Complaint. The challenged conduct attributable to each Defendant

contributed to the intentional and allegedly irrational differential treatment, rather than merely occurring during the same general period.

557. Defendants intentionally treated Plaintiffs differently from similarly situated persons and establishments without a rational basis for doing so.

558. Defendants' intentional and irrational differential treatment deprived Plaintiffs of the equal protection of the laws secured by the Fourteenth Amendment.

559. Defendants' conduct was a direct and proximate cause of the injuries and damages alleged herein.

560. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered economic losses, loss of business and business opportunities, damage to reputation and goodwill, costs and expenses incurred in responding to the challenged governmental activity, diversion of business and managerial resources, and the other injuries and damages alleged herein.

561. The conduct of the individual Defendants was intentional, willful, malicious, reckless, and/or undertaken with reckless or callous

indifference to Plaintiffs' federally protected rights, thereby supporting an award of punitive damages against those individual Defendants for whom the evidence establishes the requisite state of mind.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1-10 on Count II; compensatory and nominal damages; punitive damages against the individual Defendants and private Defendants where permitted by law; appropriate declaratory and prospective injunctive relief, including a declaration that Defendants' intentional and irrational differential treatment of Plaintiffs violates the Equal Protection Clause of the Fourteenth Amendment and an injunction prohibiting Defendants from continuing or engaging in such unconstitutional differential treatment of Plaintiffs; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

**COUNT III**
**<u>42 U.S.C. § 1983 – Municipal Liability Under *Monell*</u>**
**(Plaintiffs v. Defendant Upper Southampton Township)**

562. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

563. Defendant Township, acting through the Township Police Department and its policymakers, supervisory officials, officers, employees, and agents, maintained the policies, customs, practices, supervisory structures, and law-enforcement functions alleged herein.

564. As alleged in Counts I and II, Plaintiffs were deprived of rights secured by the Equal Protection Clause of the Fourteenth Amendment through intentional differential governmental treatment motivated by arbitrary and unjustifiable considerations, as alleged in Count I, and, alternatively, lacking a rational basis, as alleged in Count II.

565. Plaintiffs seek to hold the Township liable for the alleged Equal Protection violations arising from municipal policies, customs, practices, decisions, and deliberately indifferent failures attributable to the Township itself.

566. Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipality may be held liable under 42 U.S.C. § 1983 when a constitutional violation is caused by an official municipal policy or by a municipal custom or practice having the force of law.

567. Municipal liability may also arise where an official possessing final policymaking authority causes or adopts the challenged action, where an authorized policymaker approves or ratifies the challenged action in circumstances rendering it municipal action, or where a municipality's deliberately indifferent failure to supervise, control, or otherwise address a known or obvious risk of constitutional violations causes the constitutional injury.

568. Plaintiffs allege several alternative and overlapping bases for municipal liability under *Monell*: (a) a persistent and widespread municipal custom or practice of subjecting Pike's and Matt McCarthy to heightened and differential governmental scrutiny and surveillance; (b) authorization, approval, adoption, or ratification of the challenged conduct by officials possessing final policymaking authority; and/or (c) the Township's deliberately indifferent failure to adequately supervise,

control, review, correct, or safeguard against the use of municipal police authority to subject Pike's and the McCarthys to unconstitutional differential treatment and warrantless surveillance and tracking.

569. Each of those theories is based upon municipal action or deliberate municipal inaction alleged to have caused the underlying Equal Protection violations and is not based merely upon the Township's employment of the individual officers involved.

**Municipal Custom and Practice**

570. The challenged governmental treatment of Pike's and Matt McCarthy was not an isolated action by a single Township employee.

571. Rather, the challenged conduct occurred repeatedly over an extended period and involved multiple Township police officers and supervisory personnel.

572. The recurring conduct included, among other things:

a. directed police patrols specifically involving Pike's;
b. officer-initiated activity to determine whether Pike's had closed;
c. monitoring of Pike's and its patrons;
d. investigation into whether Matt McCarthy himself was involved in illegal drug activity;
e. recurring allegations that Pike's permitted patrons to remain at the establishment until approximately 3:30 a.m.;
f. actual or threatened referrals of Pike's to state liquor-enforcement authorities;

g. direct communications between Township police personnel and BLCE concerning Pike's;
h. Chief Varacallo's personal complaint or referral concerning Pike's to BLCE, which resulted in a BLCE investigation;
i. Township police participation in coordinated enforcement activity with BLCE concerning Pike's;
j. the designation and treatment of Pike's and/or its immediate vicinity as a "problem area" warranting heightened police attention despite comparable or more serious third-party incidents occurring in the immediate vicinity of similarly situated establishments;
k. an on-duty Township police officer's late-night monitoring and inspection of Matt McCarthy's personal vehicle outside Pike's after the establishment had closed; and
l. upon information and belief, the placement and/or use by Township police personnel of an Apple AirTag on Matt McCarthy's personal vehicle for the purpose of electronically monitoring and tracking his location and movements.

573. Plaintiffs allege that the foregoing incidents, considered collectively, reflect a recurring pattern of affirmative police scrutiny directed at Pike's and Matt McCarthy, rather than merely police responses to unrelated emergencies or requests for assistance.

574. The challenged activity extended across multiple Township police officers, supervisory levels, types of police activity, and communications and coordination with state liquor-enforcement authorities.

575. Although BLCE officers separately exercised state regulatory authority, Plaintiffs seek to attribute to the Township only

the municipal decisions, conduct, referrals, and participation of Township personnel, together with any resulting constitutional injuries proximately caused by that municipal conduct.

576. Upon information and belief, the foregoing course of conduct was sufficiently persistent, widespread, and well-settled to constitute a municipal custom or practice having the force of municipal policy with respect to the heightened and differential governmental treatment of Pike's and the surveillance and monitoring of Matt McCarthy.

577. Upon information and belief, appropriate Township policymakers and supervisory officials had actual or constructive knowledge of the foregoing custom or practice and acquiesced in, tolerated, approved, and/or permitted it to continue.

578. The involvement of multiple Township officers and supervisory personnel over an extended period, including the personal participation of Chief Varacallo, supports an inference that the challenged course of conduct was known to and acquiesced in by responsible municipal officials rather than constituting isolated misconduct by a single subordinate employee. The recurring conduct was sufficiently apparent to responsible municipal officials to permit an

inference of knowledge and acquiescence, subject to proof of the authority and knowledge of those officials.

579. Upon information and belief, despite knowledge of the recurring police and regulatory activity directed at Pike's and Matt McCarthy, responsible Township officials failed to take corrective action and permitted the challenged course of conduct to continue.

580. Matt McCarthy also personally attempted to bring his concerns regarding the Police Department's treatment of Pike's to Chief Varacallo by visiting the Department, identifying himself, and requesting a meeting. Although Matt McCarthy did not submit a formal written complaint to the Township, Board of Supervisors, or Police Department, his visit constituted an attempt to raise those concerns directly with police leadership.

**Policymaker Decision, Authorization, and Ratification**

581. Chief Varacallo, the highest-ranking official within the Township Police Department, personally participated in the challenged course of conduct.

582. Among other things, Chief Varacallo personally communicated allegations concerning Pike's to state liquor-enforcement authorities and affirmatively referred Pike's to BLCE for investigation.

583. Upon information and belief, such an affirmative referral by the Township's Chief of Police of a particular licensed establishment to BLCE for investigation was unusual and departed from the Police Department's ordinary practices concerning licensed establishments within the Township.

584. Upon information and belief, Chief Varacallo did not make comparable BLCE referrals concerning Steam Pub or other similarly situated Township establishments despite police calls, complaints, disturbances, and other incidents associated with those establishments.

585. BLCE thereafter initiated an investigation of Pike's as a result of Chief Varacallo's complaint or referral.

586. Upon information and belief, Township officials possessing final policymaking authority with respect to the matters at issue knew of, directed, authorized, approved, adopted, ratified, and/or knowingly acquiesced in the challenged course of conduct and its allegedly discriminatory or irrational basis.

587. To the extent discovery establishes that Chief Varacallo or another Township official possessed final policymaking authority under applicable state and local law with respect to the police activity challenged herein, that official directed, authorized, approved, adopted, and/or ratified the challenged conduct. Decisions by such an official directing or adopting the unconstitutional treatment constituted official municipal policy.

588. Alternatively, upon information and belief, Township officials possessing final policymaking authority knew of the repeated police activity directed at Pike's, including the involvement of supervisory police personnel, regulatory referrals, and communications and coordination with BLCE, and affirmatively approved that conduct and the allegedly unconstitutional basis for treating Pike's differently from similarly situated establishments.

589. The Township's liability under this theory arises from decisions or ratification attributable to officials possessing final policymaking authority under applicable law, rather than from the mere fact that supervisory personnel participated in or were aware of the challenged activity.

590. Upon information and belief, responsible municipal policymakers permitted the allegedly discriminatory or irrational course of police activity to continue despite its recurring nature and the involvement of multiple Township police personnel. Plaintiffs rely upon this alleged knowledge and acquiescence as evidence of municipal custom, and upon any affirmative policymaker adoption of the unconstitutional conduct and its basis as evidence of ratification.

591. The precise allocation of final policymaking authority over the challenged police practices, and the extent to which authorized Township policymakers directed, adopted, or ratified those practices, are matters concerning which Plaintiffs presently lack access to the Township's internal directives, governing enactments, and policymaker communications.

592. Upon information and belief, responsible Township policymakers had an opportunity to review, supervise, prevent, or correct the recurring course of conduct directed at Pike's and Matt McCarthy but failed to do so.

593. To the extent an official possessing final policymaking authority directed, authorized, adopted, approved, or ratified the

challenged conduct, that decision constituted official municipal action attributable to the Township for purposes of *Monell*.

**Deliberate Indifference and Failure to Supervise, Control, and Protect Against Improper Influence**

594. During much of the period in which the challenged governmental activity occurred, Defendant Hoeger simultaneously served as an elected Township Supervisor and maintained a business and financial relationship with Steam Pub, a direct competitor of Pike's.

595. Steam Pub was owned and operated by Hoeger's husband, Defendant Martin Hoeger.

596. Township officials also had a longstanding practice of regularly holding weekly Township meetings at Steam Pub. Those gatherings provided opportunities for interaction between Township officials and persons associated with Steam Pub, although the precise nature and official status of the gatherings remain to be established.

597. Defendant Officer Bankert acknowledged to Matt McCarthy that the Police Department had maintained a "good relationship" with Martin Hoeger for approximately ten years, or words to that effect.

598. The risk of improper governmental influence was particularly significant because Hoeger was not merely an elected

official unconnected to the Police Department. As a member of the Board of Supervisors, Hoeger served on the Township governing body that Pennsylvania law expressly charges with responsibility for the organization and supervision of the Township police force. *See* 53 P.S. § 66902.

599. Thus, during the same period in which Hoeger maintained a business and financial relationship with Pike's direct competitor, she simultaneously occupied a position on the governmental body possessing statutory supervisory responsibility over the Police Department whose officers and Chief were subjecting Pike's and the McCarthys to the recurring police activity alleged herein.

600. These overlapping governmental and private financial interests created a potential conflict requiring appropriate attention to safeguards, supervision, disclosure, recusal, and oversight sufficient to ensure that Township police authority was not used, influenced, or perceived to be used to advance the private competitive interests of a Township Supervisor or a business financially connected to that Supervisor.

601. Upon information and belief, the Township failed to implement, enforce, and/or follow adequate safeguards to prevent a Township Supervisor possessing a private financial interest in a business from influencing police activity concerning a direct competitor of that business.

602. Upon information and belief, responsible Township officials knew or should have known of the relationship between a sitting Township Supervisor and Steam Pub, Steam Pub's competitive relationship with Pike's, the longstanding relationship between Steam Pub and Township government and police, and the resulting risk that municipal police authority could be influenced or used to favor one private competitor over another.

603. Those circumstances, combined with the recurring and escalating police activity directed at Pike's, created an obvious need for adequate supervision, oversight, and safeguards to ensure that municipal police authority was exercised for legitimate governmental purposes rather than to advance, accommodate, or be influenced by private competitive interests.

604. Upon information and belief, the Township nevertheless failed to adequately supervise, monitor, review, investigate, or correct the recurring police activity directed at Pike's and failed to implement or enforce adequate safeguards against improper private influence over municipal law-enforcement activity.

605. Upon information and belief, the Township also failed to adequately supervise, review, and control communications and referrals by Township police personnel to state liquor-enforcement authorities where such communications and referrals could be influenced by private competitive interests.

606. The need for adequate supervision, oversight, and safeguards was particularly apparent because the challenged conduct was recurring rather than isolated, involved multiple Township police personnel and supervisory officials, and ultimately included Chief Varacallo's personal referral of Pike's to BLCE.

607. Upon information and belief, despite actual or constructive notice of these circumstances, responsible Township policymakers failed to take reasonable corrective or preventive action.

608. Upon information and belief, Township policymakers knew that Township police officers and supervisory personnel would exercise substantial discretion concerning businesses within the Township, including decisions regarding directed patrols, investigations, regulatory referrals, communications with outside enforcement agencies, and participation in coordinated enforcement activity.

609. The exercise of that governmental discretion under circumstances involving a sitting Township Supervisor's alleged business and financial relationship with a competing private establishment presented a known or obvious risk that, absent adequate supervision and safeguards, similarly situated businesses could be intentionally subjected to materially different governmental treatment for reasons unrelated to legitimate law-enforcement objectives.

610. Upon information and belief, the Township consciously failed to provide adequate supervision, oversight, review, and safeguards notwithstanding that known or obvious risk.

611. The Township's failure to supervise, control, review, correct, and/or implement adequate safeguards under these circumstances constituted a deliberate or conscious municipal choice and deliberate

indifference to the known or obvious risk that Plaintiffs would be subjected to unconstitutional differential governmental treatment. These failures were causally connected to the continuation of the challenged enforcement activity, rather than constituting merely a generalized failure to maintain ideal supervisory procedures.

612. In light of the sustained and escalating pattern of police surveillance directed at Pike's and Matt McCarthy, including officer-initiated monitoring, directed patrols, investigation of Matt McCarthy personally, and the involvement of supervisory police personnel, the need for adequate supervision and safeguards against unconstitutional surveillance and tracking was known or obvious.

613. Upon information and belief, the Township nevertheless failed to adequately supervise, review, investigate, discipline, or otherwise correct the use of police authority to conduct such surveillance.

614. The Police Department's response after Matt McCarthy discovered and reported the AirTag further supports an inference of municipal knowledge, acquiescence, and deliberate indifference. Rather than investigate the unauthorized tracking of Matt McCarthy's vehicle,

determine who had placed the device, or address the serious constitutional and safety concerns raised by its discovery, Township police advised both Matt McCarthy and his wife, in substance, that nothing could be done.

615. The Township's failure to supervise or correct the recurring differential enforcement activity permitted the challenged treatment to continue.

616. The recurring nature of the challenged police activity, the involvement of multiple officers, and Chief Varacallo's personal referral of Pike's to BLCE provided circumstances from which responsible municipal policymakers could have become aware of the alleged differential treatment and the need for appropriate review.

617. Upon information and belief, the Township nevertheless failed to take corrective measures sufficient to prevent the continuation of the allegedly unconstitutional differential treatment, despite the asserted notice and opportunities for municipal intervention described above.

618. The constitutional deprivations alleged herein were caused or permitted to continue as a known or obvious consequence of the

municipal failures and inadequacies described above, to the extent those failures amounted to deliberate indifference and were a moving force behind the constitutional violations.

**Causation and Moving Force**

619. The municipal customs and practices, acts and decisions of officials possessing final policymaking authority, authorization, approval or ratification, and/or deliberately indifferent municipal failures alleged above directly caused, facilitated, and permitted the continuing course of differential governmental treatment directed at Pike's and the unconstitutional surveillance and tracking of Matt McCarthy.

620. The challenged governmental conduct was able to continue, upon information and belief, because responsible Township officials authorized or acquiesced in that conduct and/or failed to adequately supervise, review, correct, or safeguard against it.

621. Had responsible Township officials adequately supervised and reviewed the challenged police activity, corrected the recurring pattern of differential treatment, and implemented appropriate safeguards against improper private influence and warrantless

electronic surveillance, the constitutional injuries alleged herein would have been prevented or materially curtailed.

622. The municipal customs, practices, policymaker decisions, authorization, ratification, acquiescence, and/or deliberately indifferent failures alleged herein were the moving force behind the deprivation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

623. There was a direct causal link between the municipal action and/or deliberate municipal inaction alleged herein and the differential governmental treatment and warrantless surveillance and resulting injuries suffered by Plaintiffs, including Matt McCarthy.

624. Accordingly, the constitutional violations alleged herein are attributable to the Township itself under *Monell* and do not rest merely upon a theory of respondeat superior or the Township's employment of the individual governmental Defendants.

625. Plaintiffs presently lack access to the Township's internal policies, directives, supervisory communications, policymaker communications, training and supervisory materials, disciplinary and internal-review records, communications concerning Pike's and Steam

Pub, and other evidence concerning municipal authorization, knowledge, acquiescence, supervision, and ratification. Plaintiffs likewise presently lack access to the Township's records concerning the placement, authorization, ownership, monitoring, access, use, investigation, or reporting of the AirTag discovered on Matt McCarthy's vehicle.

626. Such information is principally within the Township's possession and control and may bear upon the identification of final municipal policymakers, the existence of a relevant municipal custom, the Township's knowledge of the challenged conduct, and the causal relationship between municipal action or inaction and Plaintiffs' alleged injuries.

627. As a direct and proximate result of the Township's municipal customs, practices, policymaker decisions, authorization, ratification, acquiescence, and/or deliberately indifferent failures, Plaintiffs suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendant Upper Southampton Township on Count III; compensatory and nominal damages; appropriate declaratory and

prospective injunctive relief, including a declaration that the Township's policies, customs, practices, deliberate indifference, failures of supervision and oversight, and/or actions of final policymakers alleged herein caused violations of Plaintiffs' constitutional rights, and an injunction requiring the Township to cease and prevent the continuation or recurrence of the unconstitutional policies, customs, practices, and conduct alleged herein, including unconstitutional selective and differential enforcement, retaliatory governmental treatment, and warrantless electronic tracking or surveillance; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate the Fourteenth Amendment Right to Equal Protection**
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1–10)**

628. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

629. As alleged in Counts I and II, Plaintiffs possessed a federally protected right under the Equal Protection Clause of the Fourteenth

Amendment not to be intentionally subjected to materially different governmental treatment from similarly situated persons and businesses on the basis of arbitrary or unjustifiable considerations, as alleged in Count I, or without a rational basis, as alleged in Count II.

630. A conspiracy actionable under 42 U.S.C. § 1983 exists where two or more persons reach an agreement, understanding, or meeting of the minds to deprive a plaintiff of a federally protected right and engage in concerted action in furtherance of that agreement that results in the deprivation of the federally protected right.

631. The conspiratorial agreement need not be express and may be established by a tacit understanding and inferred from the circumstances, including the relationship among the participants, their communications and conduct, the sequence and pattern of events, and acts undertaken in furtherance of the common objective.

**Agreement, Understanding, and Concerted Action**

632. Upon information and belief, Defendants reached an agreement, understanding, meeting of the minds, and/or jointly accepted plan, whether express or tacit, to cause, facilitate, encourage, and/or participate in heightened and differential governmental scrutiny

of Pike's and the McCarthys for the purpose of subjecting them to unconstitutional selective enforcement and/or irrational differential treatment.

633. The essential nature and object of the agreement was to use, cause, facilitate, and/or influence the exercise of governmental police and regulatory authority against Pike's in a materially different manner from similarly situated establishments based upon arbitrary or unjustifiable considerations and/or without a rational basis, thereby disadvantaging Pike's and, in whole or substantial part, benefiting Steam Pub and/or the Hoegers.

634. Upon information and belief, each Defendant who joined the conspiracy knew the essential nature and general scope of the agreement or understanding and knowingly and intentionally participated in furthering its object. Each such participant shared the general objective of causing unconstitutional differential treatment, even if the participants performed different acts in furtherance of that objective.

635. The alleged conspiracy operated against the backdrop of direct and increasing commercial competition between Pike's and

Steam Pub. After the McCarthys acquired Pike's in March 2020, Pike's business grew and increasingly competed with Steam Pub for customers, events, food and beverage sales, and other business.

636. Because Martin Hoeger owned and operated Steam Pub and Hoeger maintained a business and financial relationship with Steam Pub while simultaneously serving as a Township Supervisor, the Hoegers possessed a direct economic interest in Steam Pub's success and a corresponding economic motive to disadvantage Pike's.

637. That economic motive, together with Hoeger's governmental position and access, the Hoegers' longstanding relationships with Township officials and police personnel, and the subsequent pattern of differential governmental activity directed at Pike's, constitutes circumstantial evidence supporting Plaintiffs' allegation of an agreement, understanding, or concerted course of action.

638. Upon information and belief, Hoeger affirmatively used the access and opportunities afforded by her governmental position to encourage, request, facilitate, and/or cause governmental scrutiny of Pike's in furtherance of the alleged common objective.

639. Plaintiffs do not allege a conspiracy merely because Defendants interacted with one another, communicated concerning Pike's, or participated independently in governmental activity involving Pike's.

640. Rather, Plaintiffs allege that the relationships, communications, sequence of events, recurring and overlapping allegations, pattern of governmental activity, and concerted conduct alleged throughout this Complaint collectively support a reasonable inference that Defendants reached and acted pursuant to an agreement or understanding concerning the differential governmental treatment of Pike's. The agreement concerned the improper purpose and manner of the challenged enforcement activity, rather than simply lawful cooperation in investigating suspected violations.

641. Upon information and belief, the conspiracy began no later than the period during which Township police commenced the pattern of heightened scrutiny alleged herein and continued through at least the recurring Township police and BLCE activity described in this Complaint.

642. Hoeger's participation in the alleged conspiracy occurred, in whole or substantial part, while she remained an elected Township Supervisor and before her resignation from the Board of Supervisors in May 2026.

643. During that period, Hoeger simultaneously occupied public office and performed accounting work for and/or maintained a business and financial relationship with Steam Pub, a direct competitor of Pike's owned and operated by her husband, Defendant Martin Hoeger.

644. Upon information and belief, Hoeger used the access, influence, and opportunities afforded by her public office to communicate with, influence, encourage, facilitate, and/or coordinate with governmental actors concerning Pike's and the McCarthys in furtherance of the alleged agreement.

645. Upon information and belief, Martin Hoeger and/or Steam Pub communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Hoeger, Township officials, Township police personnel, and/or other governmental actors with knowledge of and for the purpose of furthering the alleged agreement.

646. Upon information and belief, the governmental Defendants received and acted upon complaints, allegations, information, requests, and/or communications originating from or facilitated by the Hoegers and/or Steam Pub and knowingly participated in the resulting course of heightened governmental scrutiny. Such participation was undertaken pursuant to the claimed common objective of subjecting Pike's to unconstitutional differential treatment, rather than merely responding independently to information concerning possible violations.

**Circumstances Supporting the Agreement**

647. The existence of the alleged agreement, understanding, or meeting of the minds is supported circumstantially by the facts alleged throughout this Complaint, including, among other things:

a. the direct competitive relationship between Pike's and Steam Pub;
b. Hoeger's simultaneous position as an elected Township Supervisor and her business and financial relationship with Steam Pub;
c. Hoeger's membership on the five-member Township Board of Supervisors, the governmental body statutorily charged with responsibility for the organization and supervision of the Township police force, thereby providing Hoeger with official governmental status, access, influence, and opportunities to communicate with police leadership concerning matters affecting Pike's;
d. the reported statement by a woman believed to be Hoeger that Pike's would serve underage patrons, which reflects the same

type of accusation that became the subject of repeated Township police and BLCE investigations of Pike's;

e. Martin Hoeger's ownership and operation of Steam Pub;
f. the longstanding relationship between Steam Pub and Township government;
g. the Board of Supervisors' regular practice for years of holding weekly Township meetings at Steam Pub;
h. Officer Bankert's statement to Matt McCarthy that the Police Department had maintained a "good relationship" with Martin Hoeger for approximately ten years, or words to that effect;
i. the recurring pattern of directed and officer-initiated police activity concerning Pike's;
j. Officer Bankert's investigation into whether Matt McCarthy himself was involved in drug dealing;
k. Sergeant Hartranft's accusation to Matt McCarthy that Pike's routinely permitted patrons to remain in the establishment until approximately 3:30 a.m.;
l. the materially similar allegation subsequently communicated by Chief Varacallo to state liquor-enforcement authorities;
m. repeated actual or threatened regulatory referrals concerning Pike's;
n. Chief Varacallo's documented complaint or referral concerning Pike's to BLCE, which resulted in a BLCE investigation;
o. direct communications between Township police personnel and BLCE personnel concerning Pike's;
p. the coordinated February 2025 Township police/BLCE enforcement operation at Pike's;
q. repeated BLCE undercover investigations and enforcement activity involving Pike's;
r. Officer Fetterolf's statements concerning previously contemplated enforcement activity at Pike's and his repeated assertions that Pike's had a "drug problem";
s. the continuation of heightened governmental scrutiny over an extended period involving multiple governmental actors; and
t. the materially different treatment allegedly afforded to Steam Pub and other similarly situated establishments.

648. The recurrence of materially similar allegations through different governmental actors is particularly probative of concerted action. Sergeant Hartranft accused Pike's of permitting patrons to remain until approximately 3:30 a.m., and Chief Varacallo subsequently communicated a materially similar allegation to BLCE in connection with his complaint or referral concerning Pike's.

649. Likewise, allegations concerning drugs associated with Pike's appeared in both Township police activity and subsequent statements by BLCE Officer Fetterolf that Pike's had a "drug problem."

650. Plaintiffs allege that these overlapping allegations, together with the recurring communications, referrals, and coordinated governmental activity described herein, support an inference that information and allegations concerning Pike's were being communicated among and acted upon by participants in the alleged conspiracy rather than arising solely from unrelated and independent governmental decisions. The claimed agreement concerned the use of that information to subject Pike's to intentionally discriminatory or irrational enforcement, not merely the lawful exchange of information between police and regulatory personnel.

**Overt Acts in Furtherance of the Conspiracy**

651. Defendants committed and caused overt acts in furtherance of the alleged agreement and common objective.

652. Upon information and belief, the Hoegers and/or Steam Pub communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to governmental actors in furtherance of the alleged conspiracy.

653. Township police personnel conducted directed patrols and officer-initiated closing-time activity concerning Pike's.

654. Township police investigated allegations of illegal drug activity associated with Pike's, including questioning individuals concerning whether Matt McCarthy himself was involved in drug dealing.

655. Township police personnel made and/or threatened referrals of Pike's to state liquor-enforcement authorities.

656. Chief Varacallo personally communicated allegations concerning Pike's to BLCE and affirmatively caused or initiated a BLCE investigation through his complaint or referral.

657. Township police personnel and BLCE personnel communicated directly concerning Pike's.

658. BLCE personnel conducted repeated undercover investigations, inspections, and enforcement activity concerning Pike's.

659. Township police personnel and BLCE personnel jointly participated in the February 2025 enforcement operation at Pike's.

660. BLCE Officers Brutosky, Fetterolf, Blaker, and Roskos engaged in the investigative and enforcement conduct alleged herein, which Plaintiffs allege was undertaken, in whole or substantial part, pursuant to the conspiratorial agreement and common objective.

661. The overt acts alleged above and throughout this Complaint subjected Pike's and the McCarthys to the heightened and differential governmental treatment that was the object of the alleged conspiracy. These acts caused the underlying Equal Protection deprivation, rather than constituting actionable conspiracy merely because governmental personnel communicated or cooperated with one another.

**State Action and Constitutional Deprivation**

662. Defendants Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and the governmental John Doe

Defendants acted under color of state law in engaging in the governmental conduct alleged herein.

663. To the extent Hoeger used the access, influence, and opportunities afforded by her position as an elected Township Supervisor to participate in, facilitate, influence, or further the alleged conspiracy and resulting governmental action, Hoeger acted under color of state law.

664. Upon information and belief, Martin Hoeger and Steam Pub were not merely private persons who independently provided information to governmental authorities. Rather, they willfully participated in joint activity with persons acting under color of state law pursuant to the agreement or understanding alleged herein.

665. By reaching and acting pursuant to an agreement or understanding with persons acting under color of state law to deprive Plaintiffs of federally protected rights, Martin Hoeger and Steam Pub acted under color of state law for purposes of 42 U.S.C. § 1983.

666. In furtherance of the conspiracy, Defendants intentionally subjected Plaintiffs to materially different governmental treatment from similarly situated establishments and their owners and operators

based upon arbitrary or unjustifiable considerations, as alleged in Count I, and/or without a rational basis, as more fully alleged in Count II.

667. The acts committed in furtherance of the conspiracy therefore resulted in an actual deprivation of Plaintiffs' rights secured by the Equal Protection Clause of the Fourteenth Amendment.

668. The conspiracy itself is not alleged as a freestanding constitutional injury; rather, Defendants are liable under § 1983 because they agreed and acted in concert to cause the underlying deprivation of Plaintiffs' Equal Protection rights alleged herein.

**Information Within Defendants' Possession and Causation**

669. The precise content, timing, participants, and extent of communications and agreements among the Hoegers, Steam Pub, Township officials, Township police personnel, BLCE personnel, and other participants in the alleged conspiracy are not presently known to Plaintiffs.

670. Evidence concerning those communications, including communications among Defendants concerning Pike's, the McCarthys, Steam Pub, police activity, BLCE referrals, investigations, and

enforcement activity, is principally within Defendants' possession and control and will be the subject of discovery.

671. Plaintiffs' conspiracy allegations nevertheless are not based solely upon the expectation that discovery will reveal an agreement, but upon the factual circumstances alleged throughout this Complaint that, taken collectively, support a reasonable inference of an agreement, understanding, meeting of the minds, and concerted action among Defendants.

672. The circumstantial evidence supports an inference of purposeful coordination to accomplish unconstitutional differential treatment, rather than merely an inference that the Defendants had opportunities to communicate or shared an interest in Pike's activities.

673. The agreement and overt acts committed in furtherance thereof were a direct and proximate cause of the deprivation of Plaintiffs' Equal Protection rights and the injuries alleged herein.

674. As a direct and proximate result of Defendants' conspiracy and the constitutional deprivation accomplished through it, Plaintiffs suffered the economic losses, damage to reputation and goodwill, costs and expenses, and other injuries and damages alleged herein.

675. The conduct of the individual Defendants was intentional, willful, malicious, reckless, and/or undertaken with reckless or callous indifference to Plaintiffs' federally protected rights, thereby supporting an award of punitive damages against those Defendants for whom the evidence establishes the requisite state of mind.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1-10 on Count IV; compensatory and nominal damages; punitive damages against those Defendants against whom such damages are permitted by law; appropriate declaratory and prospective injunctive relief, including a declaration that Defendants' agreement, concerted action, and participation in a conspiracy to subject Plaintiffs to unconstitutional selective and differential governmental treatment violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and an injunction prohibiting Defendants from continuing, furthering, participating in, or acting in concert to accomplish such unconstitutional treatment of Plaintiffs; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and

post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

**COUNT V**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Deprivation of and Substantial Interference with Protected Liberty and Property Interests in Operating Pike's Business**
**(Plaintiffs v. Defendants Hoeger, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1–10)**

676. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

677. The Due Process Clause of the Fourteenth Amendment prohibits persons acting under color of state law from depriving any person of life, liberty, or property without due process of law. The substantive component of that Clause protects qualifying liberty and property interests against governmental deprivations that are sufficiently arbitrary and egregious to violate constitutional standards.

678. The liberty to pursue a lawful calling, occupation, or business free from unreasonable governmental interference is an interest protected by the Fourteenth Amendment. *See Thomas v. Independence Township*, 463 F.3d 285, 297 (3d Cir. 2006).

679. The Fourteenth Amendment protects against governmental conduct that removes or significantly alters protected liberty and property interests in pursuing and operating a lawful business. *See id.*

680. The governmental interference challenged herein was sufficiently substantial to implicate Plaintiffs' protected interests and, considered in its entirety, was arbitrary, intentionally abusive, and conscience-shocking.

**Plaintiffs' Protected Liberty and Property Interests**

681. At all relevant times, Pike's was an established and lawfully operating restaurant and bar in Upper Southampton Township.

682. Plaintiff 2 Guyz LLC d/b/a Pike's Pub possessed legally cognizable interests associated with its ownership and operation of Pike's, including its business property and assets and its existing lawful business operations. The challenged conduct substantially interfered with those interests, rather than merely reducing the business's anticipated profitability.

683. Matt McCarthy and Jim McCarthy were actively engaged in the ownership, management, operation, and conduct of Pike's business and possessed protected liberty interests in pursuing their chosen

lawful occupation and business activities free from unreasonable governmental interference. Their asserted occupational interests are distinct from the LLC's ownership of its property, revenues, and business assets.

684. Plaintiffs do not premise this claim merely upon an asserted right to receive particular customers, particular profits, favorable governmental treatment, or protection of reputation standing alone. Nor do Plaintiffs contend that every investigation, inspection, citation, or other lawful exercise of police or regulatory authority constitutes a deprivation of substantive due process.

685. Rather, Plaintiffs allege that Defendants engaged in a sustained course of governmental conduct that substantially interfered with and significantly altered Plaintiffs' ability to pursue, operate, manage, and derive the ordinary economic benefits from their lawful business.

686. The cumulative interference went beyond ordinary economic competition, incidental regulatory burdens, or isolated governmental decisions and materially impaired Plaintiffs' ability to conduct their established business activities.

**Sustained Governmental Interference with Plaintiffs' Business**

687. Beginning no later than approximately 2024 and continuing through at least 2026, Defendants subjected Pike's and the McCarthys to a sustained and escalating course of governmental police and regulatory scrutiny.

688. The challenged conduct was not limited to a single investigation, police response, inspection, or enforcement decision.

689. Rather, as alleged throughout this Complaint, the course of governmental conduct included, among other things:

a. directed police patrols specifically involving Pike's;
b. officer-initiated closing-time checks and monitoring of whether Pike's remained open;
c. monitoring of Pike's, its operations, and its patrons;
d. investigation into whether Matt McCarthy himself was involved in illegal drug activity;
e. accusations and allegations concerning supposed drug activity associated with Pike's;
f. recurring accusations that Pike's permitted patrons to remain at the establishment until approximately 3:30 a.m.;
g. actual and threatened referrals of Pike's to state liquor-enforcement authorities;
h. direct communications between Township police personnel and BLCE concerning Pike's;
i. Chief Varacallo's affirmative complaint or referral concerning Pike's to BLCE, which resulted in a BLCE investigation;
j. repeated undercover BLCE investigations concerning Pike's;
k. repeated inspections and regulatory enforcement activity;
l. coordinated Township police and BLCE enforcement activity, including the February 2025 operation at Pike's; and

m. the continuing course of governmental scrutiny and enforcement activity alleged throughout this Complaint.

690. The challenged governmental conduct occurred repeatedly over an extended period, involved multiple Township and state law-enforcement personnel, included supervisory personnel, and subjected Pike's to recurring visible police and regulatory activity.

691. Upon information and belief, the cumulative nature, frequency, duration, and intensity of the governmental activity directed at Pike's materially exceeded the governmental scrutiny directed at similarly situated establishments.

**Significant Alteration and Impairment of Plaintiffs' Protected Interests**

692. Defendants' sustained course of conduct did not merely inconvenience Plaintiffs or cause reputational injury in the abstract.

693. The repeated and visible governmental scrutiny materially interfered with the operation of Pike's and significantly altered Plaintiffs' ability to conduct and obtain the ordinary economic benefits of their lawful business.

694. The recurring police presence, investigations, regulatory activity, undercover operations, inspections, and enforcement activity

occurred at or directly concerned Pike's and were visible or became known to customers, prospective customers, employees, event patrons, and/or other persons doing or considering doing business with Pike's.

695. The governmental activity deterred and discouraged customers and prospective customers from patronizing Pike's and interfered with Pike's ability to attract and retain business.

696. The governmental activity interfered with Pike's existing and prospective customer and event relationships and impaired Pike's ability to compete for customers, events, food and beverage sales, and other business.

697. Pike's lost customers, repeat business, events, revenues, profits, and prospective business opportunities as a result of the challenged governmental conduct.

698. Pike's also was required to divert financial, managerial, and operational resources from the ordinary conduct of its business to respond to investigations, inspections, accusations, regulatory referrals, citations, and enforcement proceedings.

699. Matt McCarthy was required to devote substantial personal and managerial time to responding to governmental scrutiny and was

personally subjected to investigation and accusations concerning supposed drug dealing and after-hours operations.

700. The investigation of Matt McCarthy personally, when considered with the recurring scrutiny of the business he managed, interfered with his ability to pursue and perform his lawful occupational activities.

701. Jim McCarthy likewise was required to devote personal and managerial time to governmental scrutiny of Pike's and personally responded to BLCE inspection and enforcement activity, including the March 16, 2026 inspection. This recurring regulatory activity interfered with his performance of his managerial and operational responsibilities.

702. The challenged governmental conduct thereby materially burdened the day-to-day operation of Pike's, impaired Plaintiffs' ability to pursue their lawful business activities, and caused concrete economic and operational injury.

703. Considered cumulatively, the duration, frequency, visibility, and economic and operational consequences of the challenged governmental conduct substantially interfered with and significantly

altered Plaintiffs' protected liberty and property interests in operating and pursuing their lawful business.

704. The challenged conduct substantially impaired Plaintiffs' practical ability to conduct their established lawful business activities, rather than merely causing diminished profits or reputational harm.

705. The injuries alleged herein therefore extend beyond injury to reputation alone and include substantial interference with Plaintiffs' ability to operate, manage, pursue, and derive economic benefit from their lawful business.

**Arbitrary and Improper Governmental Conduct**

706. Defendants intentionally participated in the sustained governmental interference with Plaintiffs' protected business interests in the respective manners alleged throughout this Complaint.

707. Upon information and belief, the challenged governmental interference was not undertaken solely for legitimate and neutral law-enforcement purposes. The challenged course of conduct, viewed cumulatively and in light of its alleged purpose, was an abuse of governmental authority sufficiently egregious to shock the contemporary conscience.

708. Rather, upon information and belief, the challenged conduct was undertaken, caused, encouraged, facilitated, and/or continued, in whole or substantial part, for the improper purpose of subjecting Pike's to heightened governmental scrutiny, impairing Pike's business operations and competitive position, and/or benefiting Steam Pub and the Hoegers.

709. The asserted purpose was to misuse governmental enforcement authority to inflict substantial business and occupational interference for private competitive advantage, rather than to carry out legitimate police or regulatory responsibilities.

710. The arbitrary and improper nature of the governmental interference is further supported by the alleged differential treatment of Pike's and Steam Pub and other similarly situated establishments, the relationship between the Hoegers and Steam Pub, Hoeger's simultaneous service as a Township Supervisor, Steam Pub's longstanding relationship with Township government and police, and the recurring pattern of governmental activity alleged herein.

711. The challenged conduct also included governmental scrutiny based upon or arising from incidents that did not establish misconduct

by Pike's, including unsubstantiated complaints, medical emergencies, individual patron conduct, crimes committed against Pike's or the McCarthys, and incidents in which Pike's itself requested or received police assistance.

712. Upon information and belief, Defendants knowingly used, participated in, facilitated, and/or caused governmental authority to be exercised in a manner that substantially interfered with Plaintiffs' protected business interests for purposes unrelated to legitimate and evenhanded governmental enforcement.

713. The sustained and deliberately targeted misuse of enforcement authority for the asserted private competitive purpose constitutes the conscience-shocking governmental conduct underlying this Count.

**Personal Participation and State Action**

714. Defendant Hoeger personally participated in, encouraged, facilitated, influenced, and/or caused the challenged governmental interference while serving as an elected Township Supervisor by using the access, influence, and opportunities afforded by her public office, as more fully alleged herein. Her participation involved the misuse of

governmental authority or influence associated with her public position, rather than merely her private economic interest in Steam Pub.

715. Chief Varacallo personally participated in the challenged governmental interference by, among other things, communicating allegations concerning Pike's to state liquor-enforcement authorities and affirmatively referring Pike's to BLCE for investigation.

716. The unusual nature of Chief Varacallo's affirmative BLCE referral, its departure from ordinary Township police practice, and the absence of comparable referrals involving Steam Pub or other similarly situated establishments further support Plaintiffs' allegation that the governmental activity directed at Pike's was not coincidental or the product of independent routine enforcement decisions.

717. Officer Kaminski personally participated by conducting directed police activity involving Pike's and threatening and/or facilitating regulatory referral concerning Pike's.

718. Officer Bankert personally participated by investigating alleged drug activity associated with Pike's, questioning individuals concerning whether Matt McCarthy himself was involved in drug dealing, and otherwise participating in heightened scrutiny of Pike's.

719. Sergeant Hartranft personally participated by confronting Matt McCarthy and accusing Pike's of routinely permitting patrons to remain at the establishment until approximately 3:30 a.m.

720. Officer Brutosky personally participated through inspections and enforcement activity involving Pike's, communications with Township police concerning Pike's, and his participation in the March 16, 2026 inspection.

721. Officer Fetterolf personally participated through the February 2025 enforcement activity and other scrutiny of Pike's and through statements concerning previously contemplated enforcement activity at Pike's and his repeated assertions that Pike's had a "drug problem."

722. Officer Blaker personally participated through repeated undercover investigations of Pike's and the disputed RAMP investigation and enforcement activity.

723. Officer Roskos personally participated through undercover investigative activity involving Pike's and participation in the February 2025 enforcement sequence.

724. Defendants Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and the governmental John Doe Defendants acted under color of state law in engaging in the governmental conduct alleged herein.

725. To the extent Hoeger used the access, influence, and opportunities afforded by her elected public office to cause, facilitate, influence, or participate in the governmental interference alleged herein, she likewise acted under color of state law.

**Deprivation Without Due Process and Causation**

726. By engaging in the sustained course of arbitrary and improper governmental interference alleged herein, Defendants deprived and/or substantially interfered with Plaintiffs' protected liberty and property interests in pursuing and operating their lawful business without due process of law, in violation of the Fourteenth Amendment.

727. The challenged interference was intentional, sufficiently substantial to implicate their protected interests, and so arbitrary and abusive in purpose and execution as to violate substantive due process.

728. Defendants' conduct substantially interfered with and significantly altered Plaintiffs' protected liberty and property interests in Pike's within the meaning of *Thomas*.

729. The conduct crossed the constitutional threshold for substantive due process because it constituted a sustained misuse of governmental enforcement authority for an improper private purpose, rather than merely negligent administration, ordinary regulatory enforcement, or an isolated mistaken decision.

730. Defendants' conduct was intentional and was a direct and proximate cause of the substantial interference with Plaintiffs' protected liberty and property interests.

731. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered lost customers, revenues, profits, events, prospective business opportunities, damage to goodwill, diversion of business and managerial resources, costs and expenses associated with responding to governmental scrutiny, and the other economic and operational injuries alleged herein.

732. The conduct of the individual Defendants was intentional, willful, malicious, reckless, and/or undertaken with reckless or callous

indifference to Plaintiffs' federally protected rights, thereby supporting an award of punitive damages against those individual Defendants for whom the evidence establishes the requisite state of mind.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Varacallo, Kaminski, Bankert, Hartranft, Brutosky, Fetterolf, Blaker, Roskos, and John Does 1-10 on Count V; compensatory and nominal damages; punitive damages against those individual Defendants for whom such damages are permitted by law; appropriate declaratory and prospective injunctive relief, including a declaration that Defendants' deprivation of and substantial interference with Plaintiffs' protected liberty and property interests in operating Pike's violated the Due Process Clause of the Fourteenth Amendment and an injunction prohibiting Defendants from continuing or engaging in such unconstitutional interference with Plaintiffs' operation of Pike's; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

## COUNT VI
## 42 U.S.C. § 1983 – Supervisory Liability
## Personal Direction, Knowledge, and Acquiescence
## (Plaintiffs v. Defendant Chief Dominic Varacallo)

733. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

734. At all times relevant hereto, Defendant Dominic Varacallo served as Chief of the Upper Southampton Township Police Department and was the highest-ranking official within the Police Department.

735. As Chief of Police, Chief Varacallo possessed supervisory authority over Township police officers and responsibility for the direction, supervision, and oversight of police activity conducted by Township police personnel.

736. Plaintiffs do not seek to impose liability upon Chief Varacallo merely because of his supervisory position or under a theory of respondeat superior.

737. Rather, Chief Varacallo was personally involved in the constitutional violations alleged herein through his own conduct, his personal direction, authorization, and/or approval of subordinate officers' conduct, and his actual knowledge of and acquiescence in the unconstitutional conduct of subordinate officers.

738. His involvement concerned the intentional and unjustifiable differential enforcement challenged in Count I and, alternatively, the intentional and irrational differential treatment challenged in Count II.

**Chief Varacallo's Personal Participation**

739. Chief Varacallo personally participated in the challenged course of conduct by communicating allegations concerning Pike's to state liquor-enforcement authorities and affirmatively referring Pike's to BLCE for investigation.

740. As a direct result of Chief Varacallo's complaint and/or referral, BLCE initiated an investigation of Pike's.

741. Upon information and belief, affirmative referrals of particular licensed establishments to BLCE by the Township Police Department—and particularly by the Chief of Police personally—were unusual and did not constitute a routine component of the Department's response to ordinary police calls, complaints, patron misconduct, or other incidents occurring at licensed establishments within the Township.

742. Upon information and belief, Chief Varacallo did not make comparable BLCE referrals concerning Steam Pub or other similarly

situated licensed establishments despite police calls, complaints, disturbances, serious third-party incidents, and/or other events associated with those establishments under circumstances Plaintiffs allege were materially comparable for purposes of determining whether a referral was warranted.

743. Chief Varacallo's personal referral of Pike's to BLCE therefore constituted an affirmative exercise of his supervisory and law-enforcement authority that caused and materially contributed to the additional regulatory scrutiny directed at Pike's.

**Direction, Authorization, and Knowing Acquiescence**

744. Upon information and belief, Chief Varacallo further personally directed, authorized, approved, and/or knowingly acquiesced in directed patrols, officer-initiated closing-time checks, monitoring, surveillance, and other heightened police activity specifically involving Pike's and the McCarthys.

745. Upon information and belief, the directed patrols and recurring officer-initiated scrutiny of Pike's were therefore not merely independent discretionary decisions of individual patrol officers, but were undertaken pursuant to Chief Varacallo's direction, authorization,

approval, and/or with his actual knowledge and acquiescence. This supervisory involvement extended to the allegedly unconstitutional purpose or manner of the differential enforcement, rather than merely to the performance of ordinary police functions.

746. Chief Varacallo had actual knowledge of the continuing and recurring police scrutiny directed at Pike's through, among other things, his position as Chief, his personal involvement in matters concerning Pike's, his communications concerning Pike's with state liquor-enforcement authorities, his personal BLCE referral, and the repeated involvement of multiple Township police officers in activity directed specifically at Pike's and the McCarthys.

747. His personal referral establishes direct knowledge of at least that component of the challenged enforcement activity; Plaintiffs further allege, upon information and belief, that he knew of the broader recurring course of police scrutiny.

748. The challenged police conduct was sufficiently recurring, sustained, and visible that, upon information and belief, Chief Varacallo knew of the pattern of heightened police activity directed at Pike's and the McCarthys.

749. Notwithstanding that knowledge, Chief Varacallo failed to terminate, correct, or prevent the unconstitutional differential treatment and instead personally participated in, encouraged, directed, approved, and/or knowingly acquiesced in its continuation. He knew of and acquiesced in the allegedly discriminatory or irrational nature of the challenged enforcement, rather than merely failing to prevent subordinate officers from conducting investigations.

750. Upon information and belief, Chief Varacallo possessed contemporaneous knowledge of the materially different treatment afforded to Pike's and similarly situated establishments, including Steam Pub, and nevertheless permitted and/or caused the heightened scrutiny of Pike's to continue.

751. Chief Varacallo knew or reasonably should have understood from the circumstances alleged herein that the continuing governmental treatment of Pike's was being applied selectively and differently from the treatment afforded to similarly situated establishments.

752. Despite that knowledge, Chief Varacallo personally took affirmative action that intensified the governmental scrutiny of Pike's

by referring Pike's to BLCE and communicating allegations concerning Pike's to state liquor-enforcement authorities.

753. Upon information and belief, Chief Varacallo's direction, authorization, approval, and/or knowing acquiescence in the recurring police activity alleged herein contributed to the continuation of the unconstitutional differential enforcement. His supervisory liability is predicated upon his personal involvement in the underlying constitutional violations, rather than upon the mere possibility that discovery may identify additional supervisory conduct.

754. Plaintiffs presently lack access to internal Township Police Department records identifying who ordered or authorized the directed patrols and other heightened police activity involving Pike's, the supervisory directives concerning Pike's, communications among Chief Varacallo and subordinate officers concerning Pike's, and the extent of Chief Varacallo's contemporaneous knowledge of and involvement in that activity. Such information is principally within Defendants' possession and control and will be the subject of discovery.

**Underlying Constitutional Violations**

755. Chief Varacallo's personal participation, direction, authorization, approval, and/or knowing acquiescence was not merely tangential to the constitutional violations alleged herein but caused, facilitated, continued, and/or materially contributed to those violations.

756. By personally participating in, directing, authorizing, approving, and/or knowingly acquiescing in the unconstitutional selective treatment alleged in Count I, Chief Varacallo deprived Plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment. He intentionally participated in differential enforcement motivated by arbitrary or unjustifiable considerations, as more fully alleged in Count I.

757. Alternatively, by personally participating in, directing, authorizing, approving, and/or knowingly acquiescing in the intentional and irrational differential treatment alleged in Count II, Chief Varacallo deprived Plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment. He intentionally participated in treating Pike's differently from similarly situated establishments without a rational basis, as more fully alleged in Count II.

758. To the extent discovery establishes that Chief Varacallo knew of, directed, authorized, approved, or knowingly acquiesced in other constitutional violations alleged in this Complaint, including unconstitutional surveillance or tracking of Matt McCarthy, Plaintiffs reserve and assert supervisory liability against Chief Varacallo to the extent supported by the facts developed in discovery.

759. Chief Varacallo acted under color of state law at all relevant times.

**Causation and Damages**

760. Chief Varacallo's conduct was a direct and proximate cause of the constitutional injuries and damages suffered by Plaintiffs.

761. As a direct and proximate result of Chief Varacallo's conduct, Plaintiffs suffered economic losses, loss of business and business opportunities, damage to reputation and goodwill, costs and expenses incurred in responding to the challenged governmental activity, diversion of business and managerial resources, and the other injuries and damages alleged herein.

762. Chief Varacallo's conduct was intentional, willful, malicious, reckless, and/or undertaken with reckless or callous indifference to

Plaintiffs' federally protected rights, thereby supporting an award of punitive damages against him in his individual capacity.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendant Dominic Varacallo on Count VI; compensatory and nominal damages; punitive damages; appropriate declaratory and prospective injunctive relief, including a declaration that Chief Varacallo's personal participation in, direction, authorization, approval, and/or knowing acquiescence in the unconstitutional conduct alleged herein violated Plaintiffs' constitutional rights and an injunction prohibiting the continuation or recurrence of such unconstitutional conduct; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; prejudgment and post-judgment interest; and such other legal and equitable relief as the Court deems just and appropriate.

## COUNT VII
## Intentional Interference with Existing and Prospective Contractual and Business Relations
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, and John Doe Private Defendants)**

763. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

764. Pennsylvania law prohibits a person from intentionally and improperly interfering with another's existing contractual relationships and prospective contractual or business relationships.

**Existing and Prospective Contractual and Business Relationships**

765. At all relevant times, Pike's maintained existing contractual and business relationships with third parties, including customers, event organizers, vendors, service providers, and other persons and entities with whom Pike's conducted business.

766. Those relationships included relationships pursuant to which customers and event organizers agreed to purchase food, beverages, event services, and/or other goods and services from Pike's and relationships pursuant to which Pike's obtained goods and services necessary to operate its business.

767. To the extent Pike's asserts interference with existing contracts, the claim concerns actual contractual commitments with identifiable third parties, rather than merely anticipated future transactions.

768. Pike's also maintained recurring business relationships with repeat customers, event organizers, and other persons and entities who

had previously patronized, scheduled events with, purchased goods or services from, or otherwise conducted business with Pike's and who were reasonably likely to continue doing so.

769. Pike's further had identifiable prospective contractual and business relationships with customers, event organizers, and other persons and entities who, based upon prior dealings, recurring patronage, communications, event planning, inquiries, anticipated bookings, and/or other objective circumstances, were reasonably likely to enter into additional contractual or profitable business relationships with Pike's.

770. Those prospective relationships were not merely speculative hopes or generalized expectations of future customers. Rather, Pike's had a reasonable probability and objectively reasonable expectation of entering into or continuing such relationships based upon its existing and recurring customer relationships, event business, prior dealings, communications, anticipated bookings, and course of business.

771. Pike's anticipated business included repeat patronage and prospective event bookings supported by prior transactions and actual

business dealings, rather than simply a general expectation that the public would continue patronizing the establishment.

**Defendants' Knowledge, Motive, and Intent**

772. Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants knew of Pike's business operations and knew that Pike's depended upon existing and recurring relationships with customers, event organizers, and other third parties and upon the continued formation of prospective customer and event relationships.

773. Upon information and belief, Defendants were aware of the nature of Pike's customer and event business and understood that recurring governmental scrutiny could interfere with those relationships.

774. As owners, operators, representatives, and/or persons financially interested in Steam Pub, a business directly competing with Pike's for customers, events, food and beverage sales, and other business, Defendants Hoeger, Martin Hoeger, and Steam Pub knew that interference with Pike's customer and event relationships would economically harm Pike's and could economically benefit Steam Pub.

775. The competitive relationship between Pike's and Steam Pub materially intensified after the McCarthys acquired Pike's in March 2020 and substantially grew the business.

776. As Pike's business grew, it increasingly competed with Steam Pub for customers, events, food and beverage sales, and other business, thereby creating a direct economic incentive for persons financially interested in Steam Pub to disadvantage Pike's competitively.

777. Defendants Hoeger and Martin Hoeger were financially interested in Steam Pub and therefore stood to benefit economically from the diversion of customers, events, and other business away from Pike's and toward Steam Pub.

778. Upon information and belief, Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants intentionally and purposefully engaged in the conduct alleged herein with the specific purpose and intent of interfering with Pike's existing contractual and business relationships, preventing prospective contractual and business relationships from occurring or continuing, harming Pike's business and

reputation, and/or obtaining a competitive economic advantage for Steam Pub.

779. Defendants intended to cause the loss or disruption of third-party business relationships, rather than merely to compete for the same customers through legitimate commercial activity.

780. The direct and increasing competition between Pike's and Steam Pub and the Hoegers' financial interest in Steam Pub provide further factual support for Defendants' alleged purpose and intent.

**Improper Interference Through Governmental Influence and Enforcement**

781. Upon information and belief, Defendants' conduct included communicating complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Township officials, Township police personnel, BLCE personnel, and/or other governmental actors.

782. Upon information and belief, Defendants made, encouraged, facilitated, and/or caused such communications with the purpose and intent that they result in heightened police and regulatory scrutiny of Pike's. The communications were intended to procure governmental action against Pike's for an improper competitive purpose, rather than merely to report suspected violations in good faith.

783. Hoeger's communications and requests to governmental officials concerning Pike's constituted affirmative acts undertaken to cause or facilitate governmental scrutiny of Pike's and thereby interfere with Pike's existing and prospective business relationships.

784. Upon information and belief, Hoeger used the access and influence associated with her position as an elected Township Supervisor to advance the alleged improper objective.

785. Upon information and belief, Defendants knew and intended that increased police presence, directed patrols, investigations, regulatory referrals, undercover activity, inspections, enforcement operations, and other visible governmental scrutiny would interfere with Pike's business operations, deter existing and prospective customers, discourage event organizers and other third parties from doing business with Pike's, and damage Pike's reputation and goodwill.

786. Upon information and belief, Defendants understood that such interference was substantially certain and/or substantially likely to result from the course of conduct they intentionally encouraged, facilitated, and/or caused.

787. Defendants' conduct was therefore specifically directed toward interfering with Pike's existing and prospective contractual and business relationships rather than merely producing an incidental or unintended effect upon Pike's business.

788. Defendants' interference with Pike's existing and prospective contractual and business relationships was intentional and improper and was undertaken without privilege or justification. The interference was improper because of the alleged use or attempted use of governmental enforcement authority to inflict competitive harm, rather than because Defendants were commercial competitors or communicated with public officials.

789. Upon information and belief, Defendants did not merely engage in legitimate competition with Pike's or truthfully provide information to governmental authorities for legitimate law-enforcement purposes.

790. Rather, upon information and belief, Defendants communicated, encouraged, facilitated, and/or acted upon complaints, allegations, information, or requests concerning Pike's for the purpose of causing heightened governmental scrutiny, harming Pike's business

relationships and reputation, and obtaining a competitive advantage for Steam Pub. The challenged conduct involved the intentional procurement or attempted manipulation of governmental enforcement for an improper private purpose.

791. Upon information and belief, the nature and purpose of Defendants' conduct, the means employed, Defendants' competitive economic interests, the interests with which Defendants interfered, and the relationship among the parties render Defendants' interference improper under the circumstances.

792. In particular, the intentional use, attempted use, procurement, or manipulation of governmental police or regulatory authority for the purpose of disadvantaging a private competitor and interfering with that competitor's customer and business relationships constitutes improper means and is not legitimate business competition. Defendants sought to obtain competitive advantage through governmental pressure and scrutiny rather than through ordinary price, service, product, or customer competition.

793. To the extent Hoeger used the access, influence, or opportunities afforded by her position as an elected Township

Supervisor to advance her own private economic interests and/or those of Steam Pub by causing, facilitating, encouraging, or influencing governmental action against Pike's, such conduct was improper and was not privileged or justified.

794. To the extent Martin Hoeger, Steam Pub, and/or the John Doe Private Defendants knowingly participated in or facilitated the use of governmental authority for the purpose of harming Pike's and obtaining a private competitive advantage, their conduct likewise was improper and without privilege or justification.

795. Each Defendant against whom this Count is asserted personally participated in or caused the challenged interference; liability is not premised merely upon association with another Defendant.

**Disruption, Causation, and Damages**

796. Defendants' intentional interference caused disruption, impairment, loss, and/or non-formation of existing and prospective contractual and business relationships involving Pike's.

797. With respect to existing contracts, the interference caused the loss, cancellation, nonperformance, or impairment of contractual

commitments to the extent established by the evidence. With respect to prospective relations, the interference prevented reasonably probable business transactions from occurring.

798. Existing and prospective customers and event patrons were deterred or discouraged from patronizing Pike's and doing business with Pike's as a result of the visible and recurring police and regulatory scrutiny alleged herein.

799. Pike's lost customers, repeat business, event business, sales, revenues, profits, and other business opportunities as a result of Defendants' interference. These losses resulted from the disruption of third-party business relationships, rather than merely from the existence of governmental scrutiny itself.

800. With respect to Pike's prospective contractual and business relationships, there existed a reasonable probability that such relationships would have occurred, continued, and/or resulted in additional profitable business but for Defendants' intentional interference.

801. Defendants' conduct was a factual, direct, and proximate cause of the disruption, impairment, loss, and/or non-formation of Pike's

existing and prospective contractual and business relationships. The governmental activity Defendants intentionally procured or facilitated was a foreseeable means by which the alleged interference was accomplished.

802. As a direct and proximate result of Defendants' intentional and improper interference, Pike's suffered actual pecuniary and legal damages, including lost revenues and profits, lost customer and event business, lost business opportunities, damage to goodwill, and other consequential economic losses in an amount to be established through discovery and at trial.

803. Defendants' conduct was intentional, willful, malicious, outrageous, and/or undertaken with reckless indifference to Pike's rights and interests, thereby supporting an award of punitive damages under Pennsylvania law.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants on Count VII; compensatory and consequential damages, including all recoverable lost profits and other economic damages; punitive damages; prejudgment and post-judgment interest;

costs; appropriate declaratory and injunctive relief to the extent permitted by law and supported by the evidence; and such other relief as the Court deems just and appropriate.

**COUNT VIII**
**Civil Conspiracy**
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, and John Doe Private Defendants)**

804. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

805. Under Pennsylvania law, a civil conspiracy exists where two or more persons combine or agree with a common purpose to commit an unlawful act or to commit an otherwise lawful act by unlawful means, act with the requisite malice and intent to injure without justification, and commit acts in furtherance of the agreement that cause actual legal damage through an independently actionable underlying tort.

**Agreement and Common Purpose**

806. Upon information and belief, Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants combined, agreed, reached an understanding, and acted in concert pursuant to a common plan and purpose to damage Pike's business, reputation, goodwill, customer relationships, and competitive position.

807. Upon information and belief, the common purpose and object of the agreement was to cause, encourage, facilitate, and/or procure heightened governmental police and regulatory scrutiny of Pike's and thereby interfere with Pike's existing and prospective contractual and business relationships.

808. The alleged agreement contemplated the intentional use or manipulation of governmental enforcement authority for an improper purpose, rather than the good-faith reporting of suspected violations.

809. The alleged conspiracy began and operated, in whole or substantial part, while Hoeger remained an elected Township Supervisor and simultaneously performed accounting work for and/or maintained a business and financial relationship with Steam Pub, a direct competitor of Pike's owned and operated by her husband, Defendant Martin Hoeger.

810. During the same period, the Board of Supervisors maintained a longstanding practice of regularly holding weekly Township meetings at Steam Pub, and Township police maintained what Officer Bankert described to Matt McCarthy as a "good

relationship" with Martin Hoeger for approximately ten years, or words to that effect.

811. Upon information and belief, each Defendant participating in the conspiracy knew the essential nature and general scope of the common plan and intentionally participated in furthering its purpose.

812. Each participant shared the objective of causing improper interference with Pike's business relationships, although the participants allegedly performed different acts toward that objective.

**Malice, Intent to Injure, and Absence of Justification**

813. Defendants acted with malice and the specific intent and purpose to injure Pike's business, contractual and business relationships, reputation, goodwill, and competitive position. Inflicting injury upon Pike's was the predominant object of the agreement, not merely an incidental consequence of legitimate competition.

814. Upon information and belief, Defendants' common purpose was not merely to engage in legitimate business competition or to protect legitimate interests, but to injure Pike's by causing governmental police and regulatory authority to be directed against a private competitor.

815. Upon information and belief, Defendants sought to accomplish that injurious purpose through improper means, including the communication, encouragement, facilitation, and/or procurement of complaints, allegations, governmental scrutiny, police activity, regulatory referrals, investigations, and enforcement activity concerning Pike's. The improper character of this conduct arose from its intended misuse of governmental authority, rather than from the mere submission of complaints or information to public officials.

816. Defendants' alleged use, attempted use, procurement, and/or manipulation of governmental police and regulatory authority to injure Pike's and interfere with its business relationships was undertaken without privilege or legitimate justification.

817. Although Steam Pub stood to obtain a competitive benefit from injury to Pike's, Defendants' alleged agreement was not merely an agreement to advance Steam Pub's legitimate business interests through lawful competition. Rather, upon information and belief, Defendants specifically intended to injure Pike's through improper governmental interference with Pike's operations and business relationships. The objective of harming Pike's was independently

intended and central to the common plan, notwithstanding any anticipated competitive benefit to Steam Pub.

818. Defendants therefore acted with the malice, intent to injure, and absence of justification required for civil-conspiracy liability under Pennsylvania law. The participants' common purpose was directed toward inflicting injury through improper means and was not justified by an independently legitimate business objective.

**Acts in Furtherance of the Conspiracy**

819. Defendants committed and caused acts in furtherance of the alleged conspiracy and its common purpose.

820. Upon information and belief, Defendants communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Hoeger, Township officials, Township police personnel, BLCE personnel, and/or other governmental actors.

821. Upon information and belief, Defendants encouraged, facilitated, influenced, and/or procured governmental scrutiny of Pike's with the purpose and intent of damaging Pike's business and interfering with its customer, event, and other business relationships.

822. Upon information and belief, Hoeger used the access, influence, and opportunities afforded by her position as an elected Township Supervisor to facilitate, encourage, and/or influence governmental activity concerning Pike's in furtherance of the conspiracy.

823. Upon information and belief, Martin Hoeger, Steam Pub, and/or the John Doe Private Defendants provided or facilitated complaints, allegations, information, and/or requests concerning Pike's with knowledge that such communications were intended to cause or encourage governmental scrutiny of Pike's. These Defendants knowingly participated in furthering the common injurious purpose, rather than merely communicating information independently.

824. The governmental scrutiny that Defendants allegedly caused, encouraged, facilitated, and/or procured included the police and regulatory activity described throughout this Complaint and was intended to and did interfere with Pike's operations, reputation, customer relationships, event business, and competitive position. The resulting interference with third-party relationships was a foreseeable

and intended consequence of the acts undertaken pursuant to the agreement.

**Independently Actionable Underlying Tort**

825. A claim for civil conspiracy under Pennsylvania law requires an independently actionable underlying tort.

826. As alleged in Count VII, Defendants intentionally and improperly interfered with Pike's existing and prospective contractual and business relations.

827. Defendants' intentional interference with Pike's existing and prospective contractual and business relations constitutes the independently actionable underlying tort supporting this civil-conspiracy claim.

828. The intentional interference alleged in Count VII was committed pursuant to and in furtherance of the agreement, common plan, and common purpose alleged in this Count. The participants agreed to accomplish the interference through the improper governmental pressure and scrutiny described in Count VII.

829. Accordingly, Pike's does not seek recovery for conspiracy as an independent tort divorced from actionable underlying misconduct,

but for the damages caused by Defendants' concerted participation in the intentional interference alleged in Count VII.

**Causation and Damages**

830. Defendants' agreement and acts in furtherance thereof caused and facilitated the interference with Pike's existing and prospective contractual and business relationships alleged in Count VII.

831. As a direct and proximate result of Defendants' conspiracy and the underlying tortious conduct committed in furtherance thereof, Pike's lost customers, repeat business, events, revenues, profits, prospective business opportunities, reputation, and goodwill and suffered the other economic injuries alleged herein.

832. Pike's thereby suffered actual legal damages as a direct and proximate result of Defendants' concerted tortious conduct.

**Circumstantial Evidence Supporting the Agreement**

833. The precise content, timing, and extent of communications and agreements among Hoeger, Martin Hoeger, Steam Pub, the John Doe Private Defendants, and the governmental actors with whom they allegedly communicated are not presently known to Pike's and are principally within Defendants' possession and control.

834. Pike's allegations of conspiracy nevertheless are not based merely upon an expectation that discovery will reveal an agreement, but upon the relationships, motive, opportunity, communications, sequence of events, pattern of governmental activity, and other factual circumstances alleged throughout this Complaint that, considered collectively, support a reasonable inference of concerted action. The circumstances support an inference of a shared injurious objective and purposeful coordination, rather than simply an opportunity to communicate or a mutual economic interest.

835. The alleged conspiracy occurred against the backdrop of increasing direct competition between Pike's and Steam Pub following the McCarthys' March 2020 acquisition and growth of Pike's business.

836. Hoeger and Martin Hoeger possessed a direct financial interest in Steam Pub and therefore had an economic motive to disadvantage Pike's, divert business from Pike's, and reduce Pike's ability to compete with Steam Pub.

837. The Hoegers' economic motive, Hoeger's simultaneous governmental position and access to Township officials, the longstanding relationship between Steam Pub and Township

government, and the subsequent pattern of governmental activity directed at Pike's collectively support Plaintiffs' allegation that Defendants acted pursuant to a common purpose rather than through unrelated or coincidental conduct. Those circumstances, considered with the alleged communications and acts in furtherance of the agreement, support the inference of concerted action.

838. Defendants' conduct was intentional, malicious, willful, outrageous, and undertaken for the purpose of injuring Pike's through improper means, thereby supporting an award of punitive damages under Pennsylvania law.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants on Count VIII; compensatory and consequential damages; punitive damages; prejudgment and post-judgment interest; costs; appropriate declaratory and injunctive relief to the extent permitted by law and supported by the evidence; and such other relief as the Court deems just and appropriate.

**COUNT IX**
**Concerted Tortious Conduct / Aiding and Abetting**
**(Pleaded in the Alternative to Civil Conspiracy)**
**(Plaintiffs v. Defendants Hoeger, Martin Hoeger, Steam Pub, and John Doe Private Defendants)**

839. Plaintiffs incorporate by reference the foregoing paragraphs of the Complaint as if the same were set forth at length herein.

840. Pike's pleads this claim in the alternative to its claim for civil conspiracy in Count VIII and, to the extent recognized under Pennsylvania law, as an alternative basis for imposing liability upon persons who knowingly acted in concert with or substantially assisted the commission of the underlying tort alleged in Count VII.

**Factual Background and Underlying Tort**

841. As alleged above, Pike's and Steam Pub are direct commercial competitors located approximately 0.3 miles apart and compete for customers, events, food and beverage sales, and other business.

842. Following the McCarthys' acquisition of Pike's in March 2020, Pike's substantially grew its business and increasingly competed with Steam Pub for customers and business.

843. Defendant Martin Hoeger owned and operated Steam Pub, and Defendant Hoeger performed accounting work for and/or maintained a business and financial relationship with Steam Pub.

844. Hoeger and Martin Hoeger therefore possessed a direct financial interest in Steam Pub's commercial success and a corresponding economic interest in disadvantaging Pike's, diverting business from Pike's, and reducing Pike's ability to compete with Steam Pub.

845. During much of the relevant period, Hoeger simultaneously served as an elected Upper Southampton Township Supervisor and thereby possessed access to Township officials, governmental personnel, and Township police personnel through her public position.

846. As alleged in Count VII, Defendants intentionally and improperly interfered with Pike's existing and prospective contractual and business relationships.

847. The intentional interference with Pike's existing and prospective contractual and business relationships constitutes the underlying tortious conduct upon which this Count is based.

**Legal Bases for Concerted Liability**

848. Under Restatement (Second) of Torts § 876(a), a person is liable for harm resulting from the tortious conduct of another where the person acts in concert with the other pursuant to a common design.

849. Alternatively, under Restatement (Second) of Torts § 876(b), a person is liable for harm resulting from the tortious conduct of another where the person knows that the other's conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other in accomplishing the tortious conduct.

**Concerted Action and Common Design**

850. Upon information and belief, Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants acted in concert and/or pursuant to a common design to cause, encourage, facilitate, and exploit heightened governmental scrutiny of Pike's for the purpose of damaging Pike's business and providing a competitive benefit to Steam Pub.

851. The common design concerned the intentional and improper interference with Pike's third-party business relationships, rather than merely an agreement to compete commercially.

852. The existence of that common design is supported by, among other circumstances, the direct commercial competition between Pike's and Steam Pub; the Hoegers' financial interest in Steam Pub; Hoeger's simultaneous position as an elected Township Supervisor; the longstanding relationships between Steam Pub, Township government, and Township police; the private Defendants' access to and communications with governmental actors concerning Pike's; and the subsequent pattern of governmental activity directed at Pike's.

853. Upon information and belief, Defendants communicated, coordinated, and acted together concerning complaints, allegations, information, and/or requests relating to Pike's and the McCarthys for the purpose of causing, encouraging, facilitating, and/or continuing governmental action adverse to Pike's.

854. Upon information and belief, Hoeger personally communicated complaints, concerns, and/or requests concerning Pike's to Township officials, police personnel, and/or other governmental actors and requested, encouraged, or facilitated governmental review, investigation, monitoring, and/or scrutiny of Pike's.

855. Upon information and belief, Martin Hoeger and/or Steam Pub likewise communicated complaints, allegations, information, and/or requests concerning Pike's and the McCarthys to Hoeger and/or governmental actors for the purpose of causing or encouraging governmental action adverse to Pike's.

856. Upon information and belief, Defendants knew that the purpose and intended effect of those communications and actions were to cause or facilitate governmental scrutiny of Pike's that would disrupt Pike's operations, burden its business, damage its reputation and goodwill, deter customers and prospective customers, and otherwise impair its existing and prospective business relationships.

857. Defendants thereafter knowingly participated in, encouraged, facilitated, assisted, and/or exploited the resulting course of conduct directed at Pike's. Plaintiffs allege affirmative participation in the allegedly improper interference, not merely the passive receipt of an incidental competitive benefit from governmental action.

858. Under § 876(a), Defendants are liable because they acted in concert and pursuant to a common design to engage in the intentional

and improper interference with Pike's existing and prospective contractual and business relationships alleged herein.

**Knowing and Substantial Assistance or Encouragement**

859. Alternatively, under § 876(b), Defendants possessed actual knowledge of the underlying tortious conduct and knowingly provided substantial assistance or encouragement to the persons engaging in that conduct.

860. Each Defendant against whom liability is sought knew that the assisted conduct involved improper interference with Pike's business relationships, rather than merely knowing that Pike's was subject to police or regulatory investigation.

861. The substantial assistance and encouragement included, upon information and belief, communicating complaints and allegations concerning Pike's; supplying information concerning Pike's and the McCarthys; using and facilitating access to Township officials and law-enforcement personnel; requesting, encouraging, or facilitating governmental scrutiny of Pike's; and otherwise assisting and encouraging the course of conduct alleged herein. These acts were performed knowingly to facilitate the underlying tortious interference

and were not merely routine or good-faith communications with governmental authorities.

862. The assistance and encouragement provided by Defendants was substantial in light of the nature and duration of the conduct, Defendants' relationships with one another, Hoeger's access to governmental officials by virtue of her elected position, Steam Pub's longstanding relationships with Township officials and police personnel, the Hoegers' financial interest in Steam Pub, and the foreseeable effect that repeated governmental scrutiny would have upon Pike's business. The assistance materially facilitated the alleged interference, rather than constituting only incidental encouragement or passive acquiescence.

863. Defendants' conduct was not limited to legitimate commercial competition or the independent, good-faith communication of truthful information to governmental authorities for legitimate purposes.

864. Rather, upon information and belief, Defendants knowingly acted in concert and/or knowingly provided substantial assistance or encouragement for the purpose of causing, facilitating, and exploiting

improper interference with Pike's existing and prospective contractual and business relationships. Plaintiffs allege actual knowledge and intentional assistance, not merely constructive knowledge, negligence, or association with another alleged tortfeasor.

**Information Within Defendants' Possession and Causation**

865. The precise content and extent of communications, coordination, assistance, and encouragement among Hoeger, Martin Hoeger, Steam Pub, the John Doe Private Defendants, Township officials, Township police personnel, and other governmental actors are not presently known to Pike's and are principally within Defendants' possession and control. The factual circumstances described throughout the Complaint provide the basis for its information-and-belief allegations, rather than relying solely upon the possibility that discovery may reveal actionable assistance.

866. Defendants' concerted conduct, substantial assistance, and/or encouragement was a factual and proximate cause of the disruption, impairment, loss, and non-formation of Pike's existing and prospective contractual and business relationships. The governmental

scrutiny allegedly procured or facilitated by Defendants was the means by which their participation caused the underlying interference.

867. As a direct and proximate result of Defendants' conduct, Pike's suffered lost customers, lost repeat business, lost events and prospective events, lost revenues and profits, lost prospective business opportunities, damage to reputation and goodwill, costs and expenses, and the other economic injuries alleged herein.

868. Defendants' conduct was intentional, willful, malicious, outrageous, and/or undertaken with reckless indifference to Pike's rights and interests, thereby supporting an award of punitive damages.

WHEREFORE, Plaintiffs request judgment in their favor and against Defendants Hoeger, Martin Hoeger, Steam Pub, and the John Doe Private Defendants on Count IX; compensatory and consequential damages; punitive damages; prejudgment and post-judgment interest; costs; appropriate declaratory and injunctive relief to the extent permitted by law and supported by the evidence; and such other legal and equitable relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: October 19, 2026

**KLEINBARD LLC**
**By:** /s/ Mark E. Seiberling
Mark E. Seiberling, Esq.
Jonathan Rava, Esq.
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Phone: (215) 496-7222
Eml: mseiberling@kleinbard.com
jrava@kleinbard.com